IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **FULLTHROTTLE TECHNOLOGIES, LLC,**<br><br>        Plaintiff,<br><br>        v.<br><br>**ROCKET MEDIA, LLC (d/b/a "LAUNCH LABS")**<br><br>        Defendant. | Case No. 1:24-cv-00314<br><br>Jury Trial Demanded |

### <u>First Amended Complaint for Patent Infringement</u>

Plaintiff FullThrottle Technologies, LLC ("fullthrottle.ai") files this Complaint against Defendant Rocket Media, LLC (d/b/a "Launch Labs") ("Launch Labs") for patent infringement and states, upon knowledge, information, and belief that Launch Labs is infringing U.S. Patent Nos. 11,556,947, 11,823,219, and 12,051,083.

The Exhibits filed with this Complaint are set forth below.

| Ex. No. | Exhibit Description |
|---|---|
| A | U.S. Patent No. 11,556,947 |
| B | U.S. Patent No. 11,823,219 |

1

| C | U.S. Patent No. 12,051,083 |
|---|---|
| D | *Safari Privacy Overview – Learn how the Safari web browser protects your privacy* (Nov. 2019) (available at [https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf](https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf)) |
| E | *Google Blogs – The next step toward phasing out third-party cookies in Chrome* (Dec. 14, 2023) (available at [https://blog.google/products/chrome/privacy-sandbox-tracking-protection/](https://blog.google/products/chrome/privacy-sandbox-tracking-protection/)) |
| F | *Google Developers – Third-party cookies restricted by default for 1% of Chrome user* (Jan. 1, 2024) (available at [https://developers.google.com/privacy-sandbox/blog/cookie-countdown-2024jan](https://developers.google.com/privacy-sandbox/blog/cookie-countdown-2024jan)) |
| G | *Launch Labs – Thriving in the Post-Third-Party Cookie Era* (Feb. 2, 2024) (available at [https://www.launchlabs.ai/post/post-third-party-cookie-era](https://www.launchlabs.ai/post/post-third-party-cookie-era)) |
| H | *Tracking and Privacy Changes for Local Business: Capitalizing on the loss of Third-Party Cookies* (available at [https://www.launchlabs.ai/ebook](https://www.launchlabs.ai/ebook)) |
| I | *fullthrottle.ai – Audience Generation* (available at [https://www.fullthrottle.ai/audience-generation/](https://www.fullthrottle.ai/audience-generation/)) |
| J | *Launch Labs – Automotive* (available at [https://www.fullthrottle.ai/automotive/](https://www.fullthrottle.ai/automotive/)) |
| K | *Launch Labs – Home* (available at [https://www.launchlabs.ai/](https://www.launchlabs.ai/)) |
| L | *Launch Labs – API Docs* (available at [https://www.launchlabs.ai/api-docs](https://www.launchlabs.ai/api-docs)) |
| M | atmain2.js JavaScript Computer Source Code taken from [https://www.launchlabs.ai/](https://www.launchlabs.ai/) on March 5, 2024 |

2

| | |
|---|---|
| N | *Launch Labs – Geolocation Marketing Demystified* (available at [https://www.launchlabs.ai/post/geolocation-marketing-demystified](https://www.launchlabs.ai/post/geolocation-marketing-demystified)) |
| O | *Launch Labs – Your First 90 Days with Ignite: A Guide to Success* (available at [https://www.launchlabs.ai/post/90-days-with-ignite](https://www.launchlabs.ai/post/90-days-with-ignite)) |
| P | HTTP Headers Received by Launch Labs |
| Q | *Launch Labs – Drive More Automotive Sales Leads From Interest to Conversion* (available at [https://www.launchlabs.ai/post/drive-more-automotive-sales-leads-from-interest-to-conversion](https://www.launchlabs.ai/post/drive-more-automotive-sales-leads-from-interest-to-conversion)) |
| R | *Launch Labs – Technology* (available at [https://www.launchlabs.ai/technology](https://www.launchlabs.ai/technology) ) |
| S | *fullthrottle.ai Patent Announcement – U.S. Patent No. 11,556,947* (available at ([https://www.globenewswire.com/en/news-release/2023/01/23/2593371/0/en/FullThrottle-Technologies-LLC-Announces-Issuance-of-Patent-for-Company-s-Proprietary-First-Party-Data-Technologies.html](https://www.globenewswire.com/en/news-release/2023/01/23/2593371/0/en/FullThrottle-Technologies-LLC-Announces-Issuance-of-Patent-for-Company-s-Proprietary-First-Party-Data-Technologies.html)) |
| T | *fullthrottle.ai Patent Announcement – U.S. Patent No. 11,823,219* (available at [https://www.globenewswire.com/news-release/2024/02/20/2832133/0/en/fullthrottle-ai-Secures-Second-Patent-to-Power-Unrivaled-Attribution-Insights-for-Audio-and-Video-Advertising.html](https://www.globenewswire.com/news-release/2024/02/20/2832133/0/en/fullthrottle-ai-Secures-Second-Patent-to-Power-Unrivaled-Attribution-Insights-for-Audio-and-Video-Advertising.html)) |
| U | *CF Search Marketing – ShopperID* (available at [https://www.cfsearchmarketing.com/shopperid/](https://www.cfsearchmarketing.com/shopperid/)) |
| V | *Launch Labs – Atlanta Honda Dealership Case Study* (available at [https://www.launchlabs.ai/case-study/atlanta-honda-dealership-case-study)](https://www.launchlabs.ai/case-study/atlanta-honda-dealership-case-study)) |

| W | *fullthrottle.ai – Home Page* (available at https://www.fullthrottle.ai/) |
|---|---|
| X | *Launch Labs – Marketing in the Age of Intelligence* (available at https://www.launchlabs.ai/post/marketing-in-the-age-of-intelligence) |

## Nature of the Action

1.    Fullthrottle.ai brings this action under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, including specifically 35 U.S.C. § 271, based on Launch Labs' infringement of U.S. Patent No. 11,556,947 ("'947 Patent") (Ex. A), which issued on January 17, 2023, U.S. Patent No. 11,823,219 ("'219 Patent") (Ex. B), which issued on November 21, 2023, and U.S. Patent No. 12,051,083, which issued on July 30, 2024 ("'083 Patent") (Ex. C). The '947, '219, and '083 Patents are collectively referred to herein as the "Asserted Patents."

2.    As detailed herein, Launch Labs through its Ignite by Launch Labs ("Ignite") product infringes at least claims 1 and 11 of the '947 Patent, claims 1, 2, 3, 19, 20, and 21 of the '219 Patent, and claims 1 and 11 of the '083 Patent (collectively, the "Asserted Claims").

3.    Fullthrottle.ai brings this action to enjoin Launch Labs' infringement of the Asserted Patents and to recover damages to fullthrottle.ai caused by Launch Labs' infringement.

5

## Parties

4.  Plaintiff fullthrottle.ai is a Delaware limited liability company with its principal place of business at 1475 Phoenixville Pike, Suite 202, West Chester, Pennsylvania 19380.

5.  On information and belief, Defendant Launch Labs is a North Carolina limited liability company with a principal place of business at 123 West Franklin Street, Suite 610, Chapel Hill, NC 27516.  On information and belief, Launch Labs operates the website at https://www.launchlabs.ai/ and uses, markets, advertises, and sells services associated with Ignite.

## Subject Matter Jurisdiction

6.  This Court has subject matter jurisdiction over the patent infringement claims asserted by fullthrottle.ai in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claim(s) arise under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, including specifically 35 U.S.C. § 271.

## Personal Jurisdiction and Venue

7.  Personal jurisdiction over Launch Labs is proper in

6

this District because Launch Labs is a North Carolina limited liability company, and therefore this Court has general jurisdiction over Launch Labs.

8. Personal jurisdiction over Launch Labs is further proper in this District because Launch Labs has purposively availed itself of the laws and forum of North Carolina and reasonably anticipated that it could be sued in this District. Launch Labs' corporate offices are located in this District in Orange County at 123 West Franklin Street, Suite 610, Chapel Hill, NC. Further, Launch Labs has committed acts of patent infringement in this District as described herein and has derived substantial revenue from its infringement in this District. Use of Launch Labs' products and services, including Ignite, infringe at least the Asserted Claims of the '947, '219, and '083 Patents. Launch Labs contacts with this District are systematic and continuous.

9. Venue is proper over Launch Labs for fullthrottle.ai's patent infringement claims under 28 U.S.C. § 1400(b) because Launch Labs is incorporated in North Carolina and therefore resides in this District under 28 U.S.C. § 1400(b). Venue is also proper under 35 U.S.C. §

7

1400(b) because Launch Labs has a regular and established place of business in this District and has committed acts of infringement in this District.

**Facts**

**The World is Trending Towards Eliminating Third-Party Cookies**

10. People interact with the internet using computer internet browsers (*e.g.,* Google Chrome, Apple Safari, Microsoft Explorer). Website servers can generate "cookies." Cookies are bits of data and comprise multiple alphanumeric or special characters. Cookies can be of variable length, *e.g.,* depending on their application. For example, certain cookies can be thousands of characters long. Cookies can be saved to a user's internet browser. Cookies are used to enable a number of technical features, including, for example, user authentication, website security, and session management.

11. Cookies can be used by website owners to embed certain information in a user's internet browser. Often, this information is provided as key-value pairs. In response, the internet browser saves this information to a file on the user's computing device. Cookies can be saved on the user's

8

computing device for a defined period of time. A user can also choose to erase all the cookies stored by their internet browser. Alternatively, a user can reject the cookies from a website server. Because cookies can be cleared or rejected by a user, they may not be accessible to website servers upon subsequent visits to the website (*e.g.*, cookies may not be persistent across subsequent website visits).

12. Generally, when a user visits a website or surfs the internet, the user's internet browser will send all of the relevant cookies to the website server in the background. Cookies are transmitted by internet browsers to website servers using header fields defined in the HTTP protocol.[1] The exchange of cookies and the information included therein occurs essentially instantaneously using computer code and without interaction by the user. The website servers can use the information stored in cookies for a given user to, for example, perform user authentication, maintain website security, and perform session management.

13. Certain types of cookies are managed and tracked by

---

[1] HTTP refers to the hypertext transfer protocol and is used by the internet, for example, to transfer information between network devices.

websites other than the website that a user is currently visiting. Because they are managed and tracked by external websites, these types of cookies are referred to as "third-party cookies." Third-party cookies can be used to track what an individual searches for, what websites an individual visits the most, and/or what news articles an individual consumes.

14. Third-party cookies can be used to save a user's preferences for a particular website. These saved preferences are beneficial because the internet browser can use the saved preferences rather than asking the user for the information each time the user visits a website. Third-party cookies can also contain information that identifies a user, provides the user's location, and permits tracking the user within a website and through the internet. Using third-party cookies, websites can identify and track visitors, as they interact with or browse different webpages on a website during an initial website visit.

15. Third-party cookies have several benefits, including, for example, permitting users to connect with brands and/or retailers of products or services that they

10

desire. Brands and retailers use third-party cookies to store data about their customers, including their settings (*e.g.*, username and password), past browsing history (*e.g.*, previously viewed items, items saved in shopping cart, *etc.*), and/or preferences (*e.g.*, preferred payment method), so that they can easily connect them with the goods and services they desire and easily make transactions.

16. Third-party cookies can also be used to track a user's browsing activity across the internet to provide personalized content and ads. For example, third-party cookies can be used to track what webpages a user visits, how long the user stayed on a webpage, the device they were using, their time zone, what language they're using, where they're logging in from, the operating system of the device they are on, *etc*. This is beneficial because it permits users to receive targeted information that pertains to the user and/or the user's device. For example, website servers may use the information provided by cookies to display websites in a certain language. Website servers may also use the information provided by cookies to display websites in a different format, for example, based on if the user is viewing

11

the website on a mobile phone or on a desktop or laptop computer.

17. Third-party cookies are often employed by companies (*e.g.*, retailers and/or marketing companies) for tracking users as they browse multiple websites. With the information provided by third-party cookies, companies can understand an individual's likes and dislikes. They can also use this information to understand the goods and services that an individual may be interested in purchasing. Companies can further use data analytics with third-party information to generate additional information about a user. Brands leverage this powerful information provided by third-party cookies so that customers receive beneficial information based on their specific interests.

18. For example, third-party cookies have been used by the automotive industry. With the information provided by third-party cookies, automotive dealers can understand what car listing(s) an individual looked at, how frequently that individual viewed a listing(s), and/or whether that individual currently has a car and, if so, the make and/or model of the car. Having this information is beneficial both

12

to the customer and the car dealer. For example, if a customer is interested in purchasing a certain car and visits a car dealer's website, the car dealer can use third-party cookies to identify the customer and provide the customer with information about the car via, for example, direct messaging (*e.g.*, email or text messages). This interaction is valuable to both parties. The customer may be interested in purchasing a vehicle but only at a certain price or with certain conditions attached. By using third-party cookies, the car dealer can provide personalized information such as a reduced price, preferrable financing, or warranty terms. Without this interaction, the customer and the car dealer may miss an opportunity to connect in a way that is beneficial to both parties.

19. Certain companies have, however, banned or restricted the use of third-party cookies on internet browsers because of privacy concerns. For example, Safari, Apple's internet browser, blocks "cookie-based tracking," and "works to prevent advertisers and websites from using the unique combination of characteristics of a device to create a 'fingerprint' to track the user online" (Ex. D, *Safari*

*Privacy Overview – Learn how the Safari web browser protects your privacy* (Nov. 2019), https://www.apple.com/safari/docs/Safari_White_Paper_Nov_2019.pdf), p. 4). Likewise, Google's Chrome internet browser began restricting the use of certain cookies in 2023 (*See* Ex. E, *The next step toward phasing out third-party cookies in Chrome* (Dec. 14, 2023), https://blog.google/products/chrome/privacy-sandbox-tracking-protection/); Ex. F, https://developers.google.com/privacy-sandbox/blog/cookie-countdown-2024jan). Defendant Launch Labs appreciates this reality and the technical problem it has created and states that the "digital landscape is undergoing a seismic shift," because "[m]ajor browsers Apple Safari and Mozilla Firefox have already banned third-party cookies, and Google Chrome has started restricting them for users. By the end of 2024, this change will impact everyone" (Ex. G, https://www.launchlabs.ai/post/post-third-party-cookie-era; *see also* Ex. H, *Tracking and Privacy Changes for Local Business: Capitalizing on the loss of Third-Party Cookies*, https://www.launchlabs.ai/post/post-third-party-cookie-

14

era).

20.  Without third-party cookies, businesses are being forced to rethink how to engage with their customers.  If third-party cookies are not available, a user may be essentially invisible to the retailer.  The user may miss out on opportunities (*e.g.*, purchase a desired product on beneficial terms), and a retailer may miss out on a sale.

21.  This change in the industry has resulted in a new internet-centric technical problem in need of solving.  The Launch Labs Defendant also recognizes this internet-centric technical problem in need of solving (*e.g.*, Exs. G and H). Previously, website owners would have used third-party cookies stored on user's internet browser to facilitate the user-retailer interaction and identify and track users as they visit and interact with websites over time.  But with third-party cookies being banned or restricted, website owners and brands alike have no technical way to identify a user, each time the user visits the same web page, the number of times a user visits a web page, each time the user visits a different web page, or to determine that it was the same user accessing the internet from different devices (*e.g., a*

15

laptop and a mobile phone).  A technical problem faced by fullthrottle.ai, Google, and others, such as Launch Labs, was how to develop new computing functionality that facilitates the user-retailer interaction while still meeting certain technical constraints.  For example, any solution would have to work without the use of third-party cookie technology, be persistent across multiple internet browsing sessions, not slow the internet user's browsing experience, and respect user's privacy.

### Fullthrottle.ai's Platform and Patented First-Party Data Technology

22.  Fullthrottle.ai was founded in 2017 and is an award winning, end-to-end, first-party data-powered artificial intelligence (AI) company that helps consumers connect with retailers and educational institutions without third-party cookies.  Fullthrottle.ai has been recognized with the 2024 Artificial Intelligence Award, the 2023 Fortress Cyber Security Award, the Soaring 76 award from the Philadelphia Business Journal, the 2023 AI Breakthrough Award, and with Digital Technology Awards.  Fullthrottle.ai has been recognized as one of the northeast region's fastest-growing

16

private companies by Inc. magazine (https://www.fullthrottle.ai/press/).

**Example Fullthrottle.ai Awards**
**(https://www.fullthrottle.ai/)**

fullthrottle.ai™    PLATFORM ⌄   SOLUTIONS ⌄   INSIGHTS ⌄   RESOURCES ⌄   COMPANY ⌄   DEVELOPERS        LOGIN    SCHEDULE A DE

**fullthrottle.ai<sup>TM</sup> Honors & Accolades**

   

23. Fullthrottle.ai markets products and services (collectively, the "fullthrottle.ai platform") in response to the need to connect consumers and brands/educational institutions in a world where third-party cookies are not available and cannot be used to identify a user and connect the user and the retailer/educational institution. Fullthrottle.ai solved this internet-centric technical problem with its patented technology, including the technology embodied in the Asserted Patents.

24. The fullthrottle.ai inventor's solution to the third-party cookie issue involved developing a system architecture. The fullthrottle.ai inventors designed the fullthrottle.ai platform to include a back-end server(s) that

17

communicates with fullthrottle.ai computer code that is executed on an internet user's internet browser. The fullthrottle.ai computer source code is written in JavaScript. JavaScript is a computer programming language that is generally used with applications or features for websites.

25. Fullthrottle.ai's JavaScript source code is accessible to an internet user from fullthrottle.ai's customer's web pages. When an internet user navigates to a fullthrottle.ai's customer's web page, fullthrottle.ai's JavaScript code is executed on the internet user's internet browser (*e.g.*, Google Chrome, Apple Safari, Microsoft Explorer). Fullthrottle.ai's JavaScript code interacts with the internet user's internet browser to obtain anonymous information and communicates that information to fullthrottle.ai's back-end servers. Fullthrottle.ai's back-end servers then use its award-winning AI technology to use this anonymous data to identify a user and track the user. The fullthrottle.ai inventors describe this architecture and the use of scripts running on a user's internet browser in

the Asserted Patents (*e.g.*, Ex. A at 5:5-33, 6:36-39, Fig. 2).

**Diagram of fullthrottle.ai's Platform**



26. The Asserted Patents solve the technical problem created by the restriction on third-party cookies. For example, the Asserted Patents conceived of: (i) determining

that a user has not been assigned a unique identifier based on a lack of stored location data for the user computing device; (ii) assigning the unique identifier to the user; (iii) determining whether the user opted-in to or out of location tracking, based on whether a location tracker is installed on the user computing device; and (iv) send, upon determining that the user opted-out of location tracking, the unique identifier to the user computing device for storage in a local browser cache; (*e.g.*, Ex. A at 44:5-11). The Asserted Patents' determining the need to assign a unique identifier, determining how to assign and associate the unique identifier, determining when to assign the unique identifier, and assigning and where to store the unique identifier (e.g., in local browser cache) provides a faster and more efficient means of retrieving information and is a technical solution to the internet-centric problem created by internet browsers restricting the use of third-party cookies. The Asserted Patents' invention enables the user-retailer interaction and track users was not routine, well-understood or conventional because this computer functionality was previously accomplished using third-party cookies. The Asserted

20

Patent's technical solution does not disrupt the browsing experience and respects privacy.

27. The Asserted Patents also solve the problem created by the restriction against third-party cookies by using anonymous data. For example, the Asserted Patents further conceived of: (i) using anonymous data associated with a browser session; (ii) determining a physical address or household based on the anonymous data; and (iii) associating the unique identifier stored in local browser cache to the physical address. The Asserted Patents' association of the unique identifier stored in local browser cache to the physical address is another technical solution to continue the user-retailer interaction and track website engagement without using third-party cookies. The Asserted Patents' association of the unique identifier stored in local browser cache to the physical address was not routine, well-understood or conventional because this functionality was previously accomplished using third-party cookies.

28. The fullthrottle.ai inventors recognized the value in using what the '947 Patent refers to as "anonymous data (*e.g.*, data that includes no personally identifiable

information associated with the user)" such as "time, date, one or more website URLs[2], a browser type, a language, an IP address[3], and/or location data" provided by an internet user (Ex. A at 6:40-47; 43:21-48). The anonymous data can be included in an HTTP[4] header received from the internet user and can be communicated to the fullthrottle.ai back-end server with scripts (Ex. A at 6:63-67). While the anonymous data identifies information related to a user's browsing, the anonymous data does not identify the user. The '947 Patent's use of "anonymous data" protects users' privacy. The '947 Patent's use "anonymous data" to facilitate the user-retailer interaction to track users is not routine, well-understood or conventional because this was previously done using third-party cookies.

---

[2] "URL" refers to a "uniform resource locator." A URL is used to locate a resource on the Internet and conceptually is a web site address.

[3] "IP address" refers to an internet protocol address, which is an identifier that is assigned to a device that connects to the internet.

[4] HTTP means hypertext transfer protocol and is used by the internet, for example, to transfer information between network devices.

Case 1:24-cv-00314-WO-JEP    Document 24    Filed 08/07/24    Page 22 of 117

29. The fullthrottle.ai inventors further thought of assigning a unique, randomly generated, identifier to a user and storing that unique identifier in the user's local browser cache for identification (Ex. A at 44:5-11). As the '947 Patent explains, the inventor's system can assign a unique identifier that may be "unique for all browsers, all device types, all locations" or may be determined based on the data received via the browsing session (Ex. A at 44:9-16). The '947 Patent's storage of the unique identifier in local browser cache is significant because it enables persistence across browser sessions (Ex. A, 13:29-35). The '947 Patent's storage of the unique identifier in local browser cache additionally maintains speed and efficiency user's internet browser. By storing the unique identifier in the local browser cache, the '947 Patent allows for more efficient (*e.g.*, faster) retrieval of the unique identifier, for example, on subsequent visits to a website. Local browser cache is a faster and more efficient means of information retrieval. The '947 Patent's storage of the unique identifier in local browser cache to enable the user-retailer interaction and track users is not routine, well-understood

23

or conventional because this was previously accomplished using third-party cookies.

30. The fullthrottle.ai inventors also conceptualized building a user profile associated with the assigned unique identifier (Ex. A at 46:9-21). As the '947 Patent explains, the profile can be built by associating the unique identifier with user location data (Ex. A at 46:9-11). The profile can include valuable information such as web pages the user has visited, the frequency of which the user visits web pages, demographics associated with the user, and the user's determined address (Ex. A at 46:14-18). The techniques described in '947 Patent identifies the user with the unique identifier saved in the user's local browser cache upon subsequent returns to the web page. As the '947 Patent describes, "the computing device may be configured to identify subsequent return visits to the URL (*e.g.*, and related URLs) from the browser, the user computing device, and/or the physical address. For example, the computing device may store a unique identifier in the browser application (*e.g.,* using a cookie or using the local browser cache) to recognize that another browser session accessing

24

the URL is from the user computing device at the same physical address. When another user computing device at the same physical address accesses the URL, the computing device may determine that that other user computing device is the same user and/or user household" (Ex. A at 8:1-12). This technical feature was not routine, well-understood or conventional as third-party cookies were previously used.

31. The fullthrottle.ai inventors further thought of saving this assigned unique identifier in the in the local browser cache of the user even if third-party cookies were not permitted (Ex. A at 44:62-64). As the inventors explain, by saving this unique identifier in the user's local browser cache, the fullthrottle.ai system can process the user's browser cache in a subsequent visit, find the unique identifier in the browser cache, and compare the unique identifier to the saved profile to identify a user (Ex. A at 44:65-67; 45:7-12; 46:25-29). The user's browsing activity associated with the unique identifier can be saved to the user profile (Ex. A at 14-18). This technical feature was not routine, well-understood or conventional as third-party cookies were previously used.

25

32.  As the '947 Patent explains, the inventors thought of determining the user's location from the data provided by the user (*e.g.,* location tracking data, latitude/longitudinal data provided via the user's internet browser) (Ex. A at 43:32-48; 45:21-30).

33.  The inventors also thought of associating the unique identifier with the determined location (Ex. A at 45:62-63). From the determined location, the '947 Patent's inventors developed the idea of determining a physical address (e.g., postal address) from the determined location by, for example, using a map API, such as the Google Maps API (Ex. A at 45:31-41).  Based on the determined physical address, other user information can be determined such as the address type (*e.g.,* single family home, commercial building) and user demographics (Ex. A at 45:42-55).  This information can be saved to the user profile and associated with the user assigned unique identifier (Ex. A at 46:9-21).  This technical feature was not routine, well-understood or conventional as third-party cookies were previously used.

34.  The fullthrottle.ai inventors developed the idea of developing a "confidence rating" for a user (Ex. A at 46:35-

26

36).  The "confidence rating" is a measure of the user's interest in a product (Ex. A at 46:36-38).  Notifications (*e.g.*, coupons, advertisements, *etc.*) can be sent to the user based on the confidence rating, thereby facilitating interaction between the user and a retailer (Ex. A 47:6-16).  This technical feature was not routine, well-understood or conventional as third-party cookies were previously used.

35.  The fullthrottle.ai inventors further developed the idea of using the unique identifier to associate two devices to one user (Ex. A at 8:12-15); associating multiple users in a household to a unique identifier, and mapping a user that has cleared its browser cache to the user's unique identifier (Ex. A at 8:12-15; 45:14-25; 16:64-17:9).  This technical feature was not routine, well-understood or conventional as third-party cookies were previously used.

36.  The '219 Patent shares the same specification as the '947 Patent, and claims other technical improvements described in the '219 Patent.  In the '219 Patent, the inventors claimed other aspects of their inventive ideas focusing on improving the connection between retailers and consumers and tracking campaign engagement when third-party

27

cookies are not available (Ex. B at 2:26-29; 26:32-27:11). As described in the '219 Patent, by associating an anonymous user with a marketing campaign, users and retailers benefit because they can interface to have further dialogue about the product or service involved in the marketing campaign. By associating an anonymous user with a marketing campaign, brands and website owners can also track the success (or failures) of given marketing campaigns, either as a whole or in relation to certain individuals. The '219 Patent's association of anonymous user(s) with marketing campaign(s) was not routine, well-understood, or conventional because campaign engagement and tracking was previously accomplished using third-party cookies. Thus, the '219 Patent's association of anonymous users with marketing campaigns provided a technical solution to the internet centric problem created when internet browsers restrict the use of third-party cookies.

37. Campaign data includes, for example, blueprint data (*e.g.*, impression data for a time period) associated with advertising messages (Ex. B at 24:1-25:12). The '219 Patent explains that a computing device (*e.g.*, a back-end server)

28

can receive campaign data and anonymous data associated with a browser session and determine that the user accessed a URL during the browsing session (Ex. B at 24:65-67; 26:29-31; 38:55-39:1; 43:18-51). Without using third-party cookies and location tracking, the '219 Patent discusses how the user's latitude and longitude can be determined from anonymous data and/or user provided data and determining how to map the determined latitude and longitude to a physical address (Ex. B at 40:58-41:13). The fullthrotte.ai inventors determined whether the determined physical address is within a zip code covered by the campaign (Ex. B at 41:58-42:10). The '219 Patent describes determining whether the browsing session associated with the campaign was based on organic traffic indicating that the user had the intent to visit the website associated with the campaign and a probability that the browsing session was initiated in response to watching or listening to media associated with the campaign (Ex. B at 42:11-32). Moreover, the inventors recognized that the unique identifier can be used in connection with the anonymous data for identifying the user of the website associated with the campaign data (Ex. B at 41:33-57). Based on these

29

inventive concepts, the '219 Patent inventors provided improved performance in connecting users to those initiating a marketing campaign to facilitate transactions between them. This technical feature was not routine, well-understood or conventional as third-party cookies were previously used.

38. The '083 Patent also shares a common specification with the '947 and '219 Patents. The '083 Patent claims other technical improvements to the technical problem created by the restriction of third-party cookies by internet browsers. For example, the '083 Patent's inventors conceived of connecting a user's physical address to a household that is covered by a campaign without location tracking and without the user of third-party cookies (*e.g.*, Ex. C at 30:55-34:16). The '083 Patent's tracking of individuals within households was significant because it provided information that was previously not available. For example, if multiple members of a household (*e.g.*, father, mother, and daughter) are all engaging with a product or campaign, the household may be more likely to make a purchasing decision than a household where only one member is engaging with a product or campaign. The '083 Patent's connecting a user's physical address to a

30

household that is covered by a campaign was not routine, well-understood, or conventional because third-party cookies were previously used to track individuals.

39. The inventions claimed in the Asserted Patents improved the way users interact with websites, while not impacting the user's browsing experience, and providing a way for retailers to interact with a user based on their browsing preferences. The inventors' technical improvement provides better, more efficient communication and solved the problem of not having third-party cookies. As the Asserted Patents explain, the inventors' solution may "reduce the amount of signaling between a user computing device and one or more administrative devices" and "may reduce the amount of processing resources consumed by the administrative computing devices" (Ex. A at 43:1-6). The development of a unique identifier, how to assign the identifier, when to assign the unique identifier, where to save the unique identifier (*i.e.*, the local browser cache), how to associate a unique identifier with a location, develop a user profile associated with the unique identifier, use the unique identifier to track the user from the same internet browser, across devices, and a

31

household, calculate a confidence rating, and provide notifications based on the confidence rating, all without impacting the user's browsing experience, is not routine, well-understood, or conventional. Prior to the Asserted Patents, the user-retailer interaction was performed by setting and storing third-party cookies in a user's internet browser. In response to the restriction on using third-party cookies, the Asserted Patents' inventors developed novel, non-routine, and non-conventional techniques to maintain the user-retailer relationship without third-party cookies. For example, the inventors of the Asserted Patents conceived of using anonymous data from HTTP headers and storing information in a user's local browser cache to maintain the user-retailer interaction. The Asserted Patents use of anonymous data from HTTP headers protects users' privacy. The Asserted Patents storage of information in local browser cache maintains performance because information can be retrieved more quickly than over storage mediums. The Asserted Patents storage of information in local browser cache also allowed for persistence across multiple user browsing sessions.

40. An issued patent is presumed by law to be valid under 35 U.S.C. § 282. This presumption of validity applies to the patents satisfying the patent eligibility requirement of 35 U.S.C. § 101, novelty under 35 U.S.C. § 102, nonobviousness under 35 U.S.C. § 103, and the specification and claiming requirements of 35 U.S.C. § 112. The United States Patent and Trademark Office ("USPTO") issued the Asserted Patents after examining the prior art. The USPTO also issued the Asserted Patents after considering evidence of whether the claimed inventions were abstract, routine, well-understood, or conventional under 35 U.S.C. § 101. The USPTO made these assessments after considering evidence of what was routine, well-understood, or conventional (*e.g.*, descriptions found in prior art references). The USPTO issued the Asserted Patents after making its findings that the Asserted Patents satisfied the patent eligibility requirements of 35 U.S.C. § 101. The Asserted Patents are therefore presumed valid (*e.g.*, novel, non-obvious, claiming patent eligible subject matter, claiming inventions that are not abstract, and not routine, not well-understood, and non-conventional) under 35 U.S.C. § 282.

33

41. The Asserted Patents benefit customers and brands in the absence of third-party cookies. For example, when a user navigates to a fullthrottle.ai customer's website, the user may be anonymous to the website because third-party cookies are not being used by the customer website and the customer has settings (which may not be known or intended to be set) that do not permit the customer to be identified. In some instances, the customer may not intend to be anonymous and desires interaction with a retailer. For example, a customer may desire to have additional or future product information (*e.g.*, product technical descriptions, price reductions, interest rate reductions, two-for-one deals, *etc.*). The Asserted Patents provide technical ways for the customers and retailers to interact, so that the customer can be provided with relevant information and act on that information.

42. The fullthrottle.ai platform's use of anonymous first party data respects users' privacy, while still providing brands powerful insight into their website's visitors. As shown below, customers of the fullthrottle.ai platform can leverage its "patented technology for a fully

34

comprehensive digital profile completely without the use of
[third-party] cookies":

**The Fullthrottle.ai Platform uses Anonymous First Party
<u>Data and Respects Privacy (Ex. I)</u>**



43. The fullthrottle.ai platform has broad applications
across many industries. One application of the
fullthrottle.ai platform is the automative space, namely
automobile dealerships. The fullthrottle.ai platform allows
automobile dealerships to use the anonymous user data to
identify previously unknown visitors of their websites to
increase engagement, drive lead submissions, and increase
showroom and service traffic. By unearthing this previously
anonymous traffic, the fullthrottle.ai platform empowers its

35

customers to directly communicate website users with helpful information.

44.  Not only does the patented fullthrottle.ai platform allow its customers (*e.g.,* automobile dealers) to identify previously unknown visitors of their websites with using third-party cookies, it also identifies addresses associated with users so that customers can "[e]ngage the [e]ntire [h]ousehold":

**The fullthrottle.ai Platform allows Customers to Engage the Entire Household (Ex. J)**



**Unleash the Potential of First-Party Data**

Transform anonymous website traffic into tangible, first-party households, empowering you to send tailored direct mail, digital display ads, and social, audio, and video marketing messages.

**Engage the Entire Household**

Our innovative Immersive Household® marketing multiplies your impact with precision-guided, omnichannel messages that resonate with every potential influencer in the purchasing process.

45.  Using the information unearthed by the patented fullthrottle.ai platform, customers can identify powerful

36

information about its website's visitors, including household demographics and deliver continuous, personalized messaging that provides individuals with relevant offers that they want to receive. This personalized messaging serves to revive defected or uninterested customers, strengthen ties with current customers, and build lasting relationships.

**fullthrottle.ai's Business**

46. Fullthrottle.ai licenses use of its products/services in several markets two of which are the brand/retail and the agency markets (https://www.fullthrottle.ai/).

**fullthrottle.ai's Markets**



**Trusted by 6000+ Retail Businesses, Brands, and Agencies across the United States**

47. In the brand/retail market, fullthrottle.ai licenses retailers, such as a car dealers, without an intermediary agency (https://www.fullthrottle.ai/automotive/).

48. In the agency market, fullthrottle.ai contracts with agencies to connect fullthrottle.ai with customers, so that fullthrottle.ai can provide customers with access to the fullthrottle.ai platform

38

(https://www.fullthrottle.ai/advertising-agencies/).     One
fullthrottle.ai   agent   is   its   related   company   Stream
Companies.   Stream  Companies  is  a  full-service  integrated
technically        enabled        advertisement        agency
(https://www.streamcompanies.com/).    Stream  Companies  uses
the  tradename  ShopperSuite  powered  by  fullthrottle.ai
(https://www.streamcompanies.com/technology/shoppersuite/).

**ShopperSuite Powered by fullthrottle.ai**



## IDENTIFY AND MARKET TO ANONYMOUS HOUSEHOLDS



ShopperSuite, which is part of the fullthrottle.ai platform, helps electrify dealership marketing via sophisticated address mining, real-time analytics, and ROI intelligence capability.

See how ShopperSuite can go to work for you, identifying anonymous online shoppers and converting them into satisfied customers.

### Geo Location and Enrichment Technology

When it comes to sales, there's no crystal ball to give us the answers. However, Advanced Digital Location Intelligence and Predictive Analytics offer almost as much foresight.

With ShopperSuite, dealerships can identify anonymous households and deliver their first marketing messages with incredible speed, staying one step ahead of the competition.

How is this done? When a shopper visits your site, they'll be asked whether they would like to share their current location. If consumers opt in for location tracking, home and email addresses can be mined.

39

## Fullthrottle.ai's Patents

49.  To protect its business and intellectual property, fullthrottle.ai applied for patent protection with the USPTO. The USPTO issued two patents that protect fullthrottle.ai's intellectual property, the '947 and the '219 Patents.

50.  The '947 Patent, entitled "Location Determination using Anonymous Browser Data" was duly and legally issued by the USPTO on January 17, 2023 (Ex. A at 1:1-2).  A true and correct copy of the '947 Patent is attached as Exhibit A.

51.  The '947 Patent matured from U.S. Patent Application No. 17/687,992, which was filed on March 7, 2022, and claims priority to U.S. Provisional Patent Application No. 63/208,275, which was filed on June 8, 2021 (Ex. A at Cover Page).

52.  Fullthrottle.ai is the assignee of all right, title, and interest in the '947 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '947 Patent.

53. The '947 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

54. Each claim of the '947 Patent, including claims 1 and 11, is presumed valid under 35 U.S.C. § 282.

55. Independent method claim 1 of the '947 Patent is set forth below:

A method comprising:
receiving first anonymous data associated with a
   first browser session initialized by a user via a
   browser on a user computing device, wherein the
   first anonymous data comprises one or more of a
   time, a date, one or more uniform resource
   locators (URLs), a referring URL, a browser type,
   a language, an internet protocol (IP) address, or
   location data;
determining that the user accessed a URL during the
   first browser session;
determining that the user has not been assigned a
   unique identifier based on a lack of stored
   location data for the user computing device;
assigning the unique identifier to the user;
determining whether the user opted-in to or out of
   location tracking, based on whether a location
   tracker is installed on the user computing device;
sending, upon determining that the user opted-out
   of location tracking, the unique identifier to
   the user computing device for storage in a local
   browser cache;
determining a latitude coordinate and a longitude
   coordinate of the user computing device, during
   the first browser session, wherein the latitude
   coordinate and the longitude coordinate are
   determined based on the first anonymous data upon
   determining that the user opted-out of location

41

tracking, and wherein the latitude coordinate and the longitude coordinate are determined based on geo-location data retrieved from the user computing device upon determining that the user opted-in to location tracking;

identifying a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API);

associating the unique identifier to the physical address;

generating a user profile for the user using the unique identifier and physical address, the user profile comprising profile information that comprises one or more URLs the user has accessed, a frequency with which the user accessed the URL(s), demographics associated with the user, the physical address(es) associated with the user, or devices associated with the user;

updating the profile information based on second anonymous data associated with a second browser session initialized on the user computing device or another user computing device associated with the physical address;

identifying a second visit to the URL during the second browser session using the unique identifier stored in the local browser cache;

determining, using the updated profile information, a confidence rating for the user, the confidence rating indicating a quantifiable measure of the user's interest in a product;

generating one or more notifications based on one or more of the updated profile information or the confidence rating; and

determining when to send the one or more notifications to the user (Ex. A at Cover Page).

56. Claim 1 of the '947 Patent is similar to claim 11 and is directed to "[a] non-transitory, machine-readable storage device" (Ex. A at 49:16-50:9).

42

57. The '219 Patent, also entitled "Location Determination using Anonymous Browser Data," was duly and legally issued by the USPTO on November 21, 2023 (Ex. B at Cover Page). A true and correct copy of the '219 Patent is attached as Exhibit B.

58. The '219 Patent matured from U.S. Patent Application No. 17/984,417, which was filed on November 10, 2022, which is a continuation of U.S. Patent Application No. 17/687,992—the application that issued as the '947 Patent—and claims priority to U.S. Provisional Patent Application No. 63/208,275, which was filed on June 8, 2021 (Ex. B at Cover Page).

59. Fullthrottle.ai is the assignee of all right, title, and interest in the '219 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '219 Patent.

60. The '219 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

43

61.  Each claim of the '219 Patent, including claims 1, 2, 3, 19, 20, and 21, is presumed valid under 35 U.S.C. § 282.

62.  Independent method claim 1 of the '219 Patent is reproduced below:

A method comprising:
receiving campaign level data associated with a campaign;
receiving anonymous data associated with a browser session initialized by a user via a browser on a user computing device;
determining that the user accessed a uniform resource locator (URL) during the browser session;
determining a latitude coordinate and a longitude coordinate of the user computing device, during the browser session, wherein the latitude coordinate and the longitude coordinate are determined based on the anonymous data upon determining that the user opted-out of location tracking, and wherein the latitude coordinate and the longitude coordinate are determined based on geo-location data retrieved from the user computing device upon determining that the user opted-in to location tracking;
identifying a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API);
determining that the physical address is within a ZIP code covered by the campaign;
determining that the browser session was initiated by the user with an intent to visit the URL; and
determining a probability that the browser session was initiated in response to watching or listening to media associated with the campaign using the campaign level data (Ex. B at 47:50-48:12).

44

63. Claim 1 of the '219 Patent is similar to claim 19 and is directed to "[a] non-transitory, machine-readable storage device" (Ex. B at 49:11-41).

64. The '083 Patent is also entitled "Location Determination using Anonymous Browser Data," and was duly and legally issued by the USPTO on July 30, 2024 (Ex. C at Cover Page). A true and correct copy of the '083 Patent is attached as Exhibit C.

65. The '083 Patent matured from U.S. Patent Application No. 18/210,987, which was filed on June 16, 2023, which is a continuation of U.S. Patent Application No. 18/210,317, which is a continuation of U.S. Patent Application No. 17/984,418—the application that issued as the '219 Patent, which is a continuation of U.S. Patent Application No. 17/687,992—the application that issued as the '947 Patent—and claims priority to U.S. Provisional Patent Application No. 63/208,275, which was filed on June 8, 2021 (Ex. C at Cover Page).

66. Fullthrottle.ai is the assignee of all right, title, and interest in the '083 Patent, including all rights to enforce and prosecute actions for infringement and to collect

45

damages for all relevant times against infringers of the '083 Patent.

67. The '083 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

68. Each claim of the '083 Patent, including claims 1 and 21, is presumed valid under 35 U.S.C. § 282.

69. Independent method claim 1 of the '083 Patent is reproduced below:

A method comprising:
receiving first anonymous data associated with a first browser session initialized by a user in a household associated with the campaign via a browser on a user computing device, wherein the first anonymous data comprises one or more of a time, a date, one or more uniform resource locators (URLs), a referring URL, a browser type, a language, an internet protocol (IP) address, or location data;
determining that the user accessed a URL associated with a campaign during the first browser session;
determining that the user has not been assigned a unique identifier based on a lack of stored location data for the user computing device;
assigning the unique identifier to the user;
determining whether the user opted-in to or out of location tracking, based on whether a location tracker is installed on the user computing device;
sending, upon determining that the user opted-out of location tracking, the unique identifier to the user computing device for storage in a local browser cache;
determining a latitude coordinate and a longitude

coordinate of the user computing device, during the first browser session, wherein the latitude coordinate and longitude coordinate are determined based on the anonymous data upon determining that the user opted-out of location tracking, and wherein the latitude coordinate and the longitude coordinate are determined based on geo-location data retrieved from the user computing device upon determining that the user opted-in to location tracking;

identifying a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API), wherein the physical address is associated with a household covered by the campaign;

associating the unique identifier to the physical address;

generating a user profile for the user using the unique identifier and physical address, the user profile comprising profile information that comprises one or more URLs the user has accessed, the frequency with which the user accessed the URL(s), demographics associated with the user, the address(es) associated with the user, or the devices associated with the user;

determining, using the profile information, a confidence rating for the user, the confidence rating indicating a quantifiable measure of the user's interest in a product associated with the campaign;

generating one or more notifications based on one or more of the profile information or the confidence rating; and

determining whether the household performed a transaction associated with the campaign (Ex. C at 47:47-48:34).

47

70. Claim 1 of the '083 Patent is similar to claim 11 and is directed to "[a] non-transitory, machine-readable storage device" (Ex. C at 49:17-50:4).

71. Claims 1 and 11 of the '947 Patent; claims 1, 2, 3, 19, 20, and 21 of the '219 Patent; and claims 1 and 11 of the '083 Patent are collectively referred to as the "Asserted Claims."

**Launch Labs and its Infringing Ignite Product/Services**

72. Launch Labs owns and operates the website https://www.launchlabs.ai/. Launch Labs markets its technology under the trade name Ignite (Ex. K, https://www.launchlabs.ai/). Launch Labs is a knock-off of fullthrottle.ai's patented technology.

73. Launch Labs uses the same architecture as fullthrottle.ai. Just like fullthrottle.ai's JavaScript source code, Launch Labs employs JavaScript computer source code on its customers websites (*see* Ex. L). The Launch Labs JavaScript code is executed at a user's internet browser when a user navigates to a Launch Labs customer's website (Ex. M). Moreover, Lauch Labs has a back-end server that communicates with the Launch Labs JavaScript code, which is exactly how

48

fullthrottle.ai's architecture is designed (Ex. L, https://www.launchlabs.ai/api-docs). Launch Labs describes this setup in its "API Docs" (Ex. L, https://www.launchlabs.ai/api-docs).

74. The JavaScript computer source code used by Launch Labs is entitled "atmain2.js," which is installed on the Launch Labs website and runs when an individual visits Launch Labs' website (https://www.launchlabs.ai/). A true and correct copy of the atmain2.js computer source code is attached as Exhibit M. Exhibit M was taken from the https://www.launchlabs.ai/ website on March 5, 2024.

75. Similar to fullthrottle.ai's JavaScript code, the Launch Labs atmain2.js computer source code gathers data related to users and sends that information (*e.g.,* latitude and longitude coordinates) to Launch Labs' back-end platform. The annotated excerpt reproduced below is example evidence that the atmain2.js computer source code gathers data related to users and communicates that information to Launch Labs' back-end platform for generation of "visitor profiles":

49

**Annotated Excerpts from atmain2.js (Ex. M)**

```
getGuid: function() {
    fetch("https://kmdu238m3i.execute-api.us-east-1.amazonaws.com/prod/uuid").then(function(e) {
        var t = e.headers.get("ETag");
        t ? at.setCookie("atguid", t, 999) : at.setCookie("atguid", at.guid(), 999),
        at.registerSessionAndSetupEngagements(!0)
    })
},
```

76. Launch Labs and/or its Ignite product/service perform the same functionality provided by fullthrottle.ai and as claimed in fullthrottle.ai's '947, '219, and '083 Patents.

77. Although late to the game, Lauch Labs recognized the same technical problem as that identified much earlier by fullthorottle.ai—third-party cookies will not be available. Launch Labs states that the "digital landscape is undergoing a seismic shift," because "[m]ajor browsers Apple Safari and Mozilla Firefox have already banned third-party cookies, and Google Chrome has started restricting them for users. By the end of 2024, this change will impact everyone" (Ex. F, https://www.launchlabs.ai/post/post-third-party-cookie-era). Launch Labs further recognizes the problems with the loss of third-party cookies in its published "E-Book" entitled "Tracking and Privacy Changes for Local Business – Capitalizing on the loss of third party cookies" (attached as

50

Exhibit H), which is available for download on its website (https://www.launchlabs.ai/ebook).

78. Just like fullthrottle.ai's products and services, Launch Labs states that its Ignite product/service solves the problem of not having third-party cookies. In response to the "seismic shift," Launch Labs offers its customers to "Grow Your First-Party Data With Ignite":

**Excerpt from Launch Labs Website – Thriving in the Post-Third-Party Cookie Era (Ex. G)**



## Grow Your First-Party Data With Ignite

In the midst of these changes, one thing remains clear: the importance of growing your first-party data. As the foundation of your marketing efforts, first-party data provides invaluable insights into your audience's preferences, behaviors, and purchasing habits. By investing in strategies to collect and leverage this data effectively, you can future-proof your marketing efforts and ensure long-term success in a rapidly evolving digital landscape.

The best way to do all that? Ignite, Launch Labs' friction-free technology designed for both you and your visitors. You don't need third-party cookies when you can harness the power of first-party data effortlessly.

With Ignite, you can:

- **Collect invaluable visitor information without intrusive forms or tracking.** Gain deep insights into your audience without compromising their privacy.
- **Engage your audience with personalized content based on their interests and preferences.** Deliver relevant experiences that resonate, driving deeper engagement.
- **Convert leads into loyal customers with targeted offers and compelling messaging.** Utilize precise attribution and measurement to optimize your strategies for maximum ROI.
- **Measure performance with clarity and granularity.** Stitch together disparate data sources and leverage website-specific first-party data models for unparalleled attribution and measurement capabilities.

Ready to thrive in the future of marketing? Schedule a demo and discover how Ignite can empower you to collect, understand, and utilize your first-party data for exceptional results.

79. Launch Labs' E-Book "provide[s] precise insight into tackling th[e] challenge" of how "businesses, formerly reliant on third-party cookies for advertising, [can] reach shoppers and convert users into valuable customers" (Ex. H).

80. Launch Labs states that with Ignite, "[y]ou don't need third-party cookies" and instead can "harness the power

51

of first-party data effortlessly" (Ex. G, https://www.launchlabs.ai/post/post-third-party-cookie-era). Launch Labs further explains that Launch Lab's Ignite services can "[c]ollect invaluable visitor information without intrusive forms or tracking," and "[g]ain[] deep insights into your audience without compromising their privacy" (Ex. G, https://www.launchlabs.ai/post/post-third-party-cookie-era).

81. According to Launch Labs, the Ignite platform transforms "website visitors into sales" (Ex. K, https://www.launchlabs.ai/). "With Ignite, you collect their information and track their actions from the moment they land on your site" (Ex. K, https://www.launchlabs.ai/).

52

<u>**Launch Labs Website Excerpt Advertising Ignite (Ex. K)**</u>

## How Ignite works

Gain actionable insights to drive the sales
you've been striving for.





82. As further detailed below, Launch Labs describes the functionality and/or capabilities of Launch Labs and/or Ignite in the marketing materials on its website (https://www.launchlabs.ai/).

83. Launch Labs collects "website users' behaviors to build audience segments":

<u>**Excerpt from Launch Labs Website (Ex. K)**</u>





84.  Launch Labs uses "GPS data with precision, ensuring reliable location tracking" (Ex. N, https://www.launchlabs.ai/post/geolocation-marketing-demystified).  For example, Launch Labs provides location data of website users:

**Example "Visitor Profiles" from Launch Labs Website (Ex. L)**

```json
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

85. Launch Labs "match[es] the address data with public records and marketing databases to identify current residents and their interests" (Ex. N, https://www.launchlabs.ai/post/geolocation-marketing-demystified).

86. Launch Labs "[c]onverts leads into loyal customers with targeted offers and compelling messaging" (Ex. G, https://www.launchlabs.ai/post/post-third-party-cookie-era).

87. Launch Labs creates "[v]isitor profiles [that] are seamlessly converted into loads and sent direct to your CRM, complete with detailed behavior information" (Ex. R, https://www.launchlabs.ai/technology). For example, Launch Labs illustrates an example of the "visitor profiles" that the Ignite product creates on its website:

**Example "Visitor Profiles" from Launch Labs Website (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

88. Launch Labs advertises that its Ignite product identifies website users, their location, and the products that they were interested in based on the users' interaction with the website, as shown below:

**<u>Launchlabs.ai Ignite Website (Ex. K)</u>**



89. Launch Labs offers "personalized messaging to targeted advertising, our approach enables marketers to unlock the full potential of location-based data while maintaining compliance and privacy standards" (Ex. N, https://www.launchlabs.ai/post/geolocation-marketing-demystified).

90. Thus, Launch Labs touts providing the same functionality with the same architecture as that developed by fullthrottle.ai.

**Launch Labs' Infringement of Fullthrottle.ai's '947 Patent**

91. Launch Labs directly infringes by using the method claimed in claim 1 of the '947 Patent and using the non-transitory machine-readable storage device in claim 11 of the '947 Patent under 35 U.S.C. § 271(a). For example, Launch Labs directly infringed by using the Ignite product with the launchlabs.ai website, retail/brand customers, and agency customers. Launch Labs' use of the method of claim 1 of the '947 Patent, as described herein, is exemplary of Launch Labs' use of claim 11 of the '947 Patent.

92. Launch Labs' back-end platform "receiv[es] first anonymous data associated with a first browser session initialized by a user via a browser on a user computing device, wherein the first anonymous data comprises one or more of a time, a date, one or more uniform resource locators (URLs), a referring URL, a browser type, a language, an internet protocol (IP) address, or location data," and "determin[es] that the user accessed a URL during the first browser session." Launch Labs touts that its system can identify "those anonymous website visitors who slip away unconverted" (Ex. N). For example, illustrated below are

58

HTTP headers identified by the Launch Labs JavaScript that include the claimed "anonymous data." The HTTP headers include the claimed internet protocol (IP) address, date, time, referring URL, language, and browser type. The Launch Labs back-end server "receives" the anonymous data as claimed from the Launch Labs JavaScript code and determines that the user accessed the website during a first browsing session, so that the Lauch Labs back-end can identify the user and provide location data. The claimed "anonymous data" that is received by the Launch Labs back-end server is shown below, as it is identified in the Launch Labs JavaScript code.

59

**Anonymous Data Received by Launch Labs/Ignite**
**Back-End Platform (Ex. P)**



93. The Launch Labs API documentation shows that the Launch Labs back-end server receives anonymous data (*e.g.*, "list of pages visited" or URL, visit times).

**Excerpt from Launch Labs' API Documentation (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
```

```
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

94.  Launch Labs' marketing literature further shows that Launch Labs performs the claimed "receiving" step.  As shown below, Launch Labs states that "[f]rom the moment" website users "hit your webpage, Ignite collects their information and tracks their progress."

**Annotated Excerpt from Launch Labs'
Marketing Materials (Ex. Q)**



## Use Launch Labs To Do More With Your Data

Ignite by Launch Labs leverages first-party data to drive sales. Here's how it works.

1. A potential customer uses their favorite search engine to discover your dealer website. From the moment they hit your homepage, Ignite collects their information and tracks their progress. It starts with a simple prompt to share their location.

2. As they move through your site, you can see if they looked at sedans or pick-up trucks. Did they visit your financing page or check their trade-in value? Each of these actions becomes a datapoint you can use to connect with your customer.

3. Better yet, Ignite can instantly engage your automotive sales lead with personalized messaging that encourages them to take action. Text-based AI chat conversations move customers toward conversion without any added labor from your sales team.

4. Then, visitor profiles are seamlessly converted into leads and sent to your CRM. From there, your sales team can reach out, equipped with detailed behavior information about each customer.

You'll never miss another automotive sales lead due to form fatigue. The time you don't have to spend sifting through bad data can be put to better use responding to clients. And you'll have all the details you need to make a warm, useful contact.

95.  The Launch Labs back-end platform "determin[es] that the user accessed a URL during the first browser session," as claimed in the '947 Patent.  As described above, the Launch Labs back-end platform "collects and tracks" a website user's "information and tracks their progress" and does so "from the moment" the user "hits" the homepage.  Further, the Launch Labs back-end platform determines what the user viewed (*e.g.*,

62

sedan, pickup truck, financing page, trade in value) as the user "move[s] through" the site. Thus, Launch Labs back-end determines that the user accessed a URL (*e.g.*, the website address) during the first browser session. Launch Labs does this determination on the back-end. For example, the Launch Labs API documentation describes that the "list of pages visited" is determined.

**Excerpt from Launch Labs' API Documentation (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
```

63

```
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

96. On information and belief, Launch Labs' back-end platform "determin[es] that the user has not been assigned a unique identifier based on a lack of stored location data for the user computing device" and "assign[s] the unique identifier to the user," as claimed in the '947 Patent. For example, as shown below, Launch Labs claims that the Launch Labs back-end platform tracks and identifies users using unique identifiers in its marketing materials, which evidences that the Launch Labs back-end platform uses the above recited functionality:

**Excerpt from Launch Labs' Marketing Materials (Ex. R)**



Additionally, the annotated excerpt from the Launch Labs atmain2.js computer source code reproduced below illustrates that the Launch Labs back-end platform determines that a unique identifier has not been assigned to a user and assigns a unique identifier. The "guid" corresponds to the unique identifier. When this function calls the back-end server, the back-end server determines that a unique identifier has not been assigned, assigns a unique identifier, and returns a unique identifier (*e.g.*, the "guid").

**Annotated Excerpt from atmain2.js (Ex. M)**

```
getGuid: function() {
    fetch("https://kmdu238m3i.execute-api.us-east-1.amazonaws.com/prod/uuid").then(function(e) {
        var t = e.headers.get("ETag");
        t ? at.setCookie("atguid", t, 999) : at.setCookie("atguid", at.guid(), 999),
        at.registerSessionAndSetupEngagements(!0)
    })
},
```

65

97. The Launch Labs back-end platform "determin[es] whether the user opted-in to or out of location tracking, based on whether a location tracker is installed on the user computing device," as claimed in the '947 Patent. For example, Launch Labs' marketing materials claim that the Launch Labs back-end platform "leverages user-consented GPS data (those location request popups) to deliver unparalleled accuracy and reliability." This statement and similar statements indicate that Launch Labs' back-end platform determines whether a user consented to opting into or out of location tracking as claimed to obtain consented to location data.

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. N)**

**Launch Labs' Innovative Approach to Geolocation**

At Launch Labs, we've reimagined geolocation tracking for our proprietary technology, Ignite. Unlike traditional methods, Ignite leverages user-consented GPS data (those location request popups) to deliver unparalleled accuracy and reliability.

Our geolocation methodology involves a four-step process that ensures the highest quality data:

1. **High-Accuracy GPS Measurement**: We start by capturing user-consented GPS data with precision, ensuring reliable location tracking.
2. **Data Verification and Enhancement**: We validate the accuracy of each GPS measurement and enhance it with additional contextual information.
3. **Location Mapping**: Using proprietary algorithms, continuously refined for enhanced accuracy, we map your visitors' locations. The more interactions they have on your site, the more precise their location becomes, unlocking opportunities for laser-focused targeting and personalized experiences.
4. **Resident Identification**: We match the address data with public records and marketing databases to identify current residents and their interests.
5. The visitor only shares consented, non-PII geolocation data with us.

Launch Labs further claims that the Launch Labs back-end platform prompts users to share their location using location trackers using "popups." Thus, the Launch Labs back-end processes information associated with location trackers to determine whether the user opted into or out of location tracking.

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. R)**



98. Launch Labs' back-end platform "send[s], upon determining that the user opted-out of location tracking, the unique identifier to the user computing device for storage in a local browser cache," as claimed in the '947 Patent. For example, Launch Labs' marketing materials claim that the Launch Labs back-end platform "builds momentum by identifying website visitors," thereby indicating that Launch Labs assigned a unique identifier when the user has not consented to location tracking.

**Excerpt from Launch Labs' Marketing Materials (Ex. O)**

## Month 1: Fuel Your Sales Engine

### Set Expectations

While Ignite starts generating leads from day one, sales conversions can take more than 30 days. Remember, we're dealing with anonymous shoppers researching options. Ignite builds momentum by identifying website visitors and their top interests. This then fuels targeted promotions with specific offers, typically driving a 10-15% conversion rate back to your site. This re-engagement leads to longer visits, more page views, and ultimately, higher conversion rates for you.

The annotated excerpt from Launch Labs' JavaScript code reproduced below also evidences that the Launch Labs back-end platform sends unique identifiers that are stored in a local browser cache. Launch Labs' back-end platform sends the unique identifiers (*e.g.*, the "guid") when users opt-out of location tracking.

68

**Annotated Excerpts from atmain2.js (Ex. M)**

```
getGuid: function() {
    fetch("https://kmdu238m3i.execute-api.us-east-1.amazonaws.com/prod/uuid").then(function(e) {
        var t = e.headers.get("ETag");
        t ? at.setCookie("atguid", t, 999) : at.setCookie("atguid", at.guid(), 999),
        at.registerSessionAndSetupEngagements(!0)
    })
},
```

99. Launch Labs' back-end platform "determine[es] a latitude coordinate and a longitude coordinate of the user computing device, during the first browser session, wherein the latitude coordinate and the longitude coordinate are determined based on the first anonymous data upon determining that the user opted-out of location tracking, and wherein the latitude coordinate and the longitude coordinate are determined based on geo-location data retrieved from the user computing device upon determining that the user opted-in to location tracking," as claimed in the '947 Patent. For example, Launch Labs' API documentation shows that the Launch Labs back-end platform sends determined latitude and longitude coordinates. Moreover, as described above, Launch Labs touts that the Launch Labs back-end platform can determine location from consented GPS data when tracking is and is not available (Ex. N).

69

**Annotated Excerpt of Launch Labs' API Documentation (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
```

a latitude coordinate and a longitude coordinate

100. The Launch Labs back-end platform uses longitude and latitude coordinates to track the location of visitors to the Launch Labs website and its customer's websites. For example, as shown below, Launch Labs performs "High-Accuracy GPS Measurement[s]" (i.e., "a latitude coordinate and a longitude coordinate of the user computing device"):

70

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. N)**

## Launch Labs' Innovative Approach to Geolocation

At Launch Labs, we've reimagined geolocation tracking for our proprietary technology, Ignite. Unlike traditional methods, Ignite leverages user-consented GPS data (those location request popups) to deliver unparalleled accuracy and reliability.

Our geolocation methodology involves a four-step process that ensures the highest quality data:

1. **High-Accuracy GPS Measurement**: We start by capturing user-consented GPS data with precision, ensuring reliable location tracking.
2. **Data Verification and Enhancement**: We validate the accuracy of each GPS measurement and enhance it with additional contextual information.
3. **Location Mapping**: Using proprietary algorithms, continuously refined for enhanced accuracy, we map your visitors' locations. The more interactions they have on your site, the more precise their location becomes, unlocking opportunities for laser-focused targeting and personalized experiences.
4. **Resident Identification**: We match the address data with public records and marketing databases to identify current residents and their interests.
5. The visitor only shares consented, non-PII geolocation data with us.

101. The Launch Labs back-end platform "identif[ies] a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API)" and "associate[es] the unique identifier to the physical address," as claimed in the '947 Patent. On information and belief, Launch Labs stores the determined longitude and latitude coordinates to the back-end server to identify a physical address for users. For example, as shown below, Launch Labs claims that the Launch Labs back-end platform performs this method step in its marketing materials:

71

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. N)**

## Launch Labs' Innovative Approach to Geolocation

At Launch Labs, we've reimagined geolocation tracking for our proprietary technology, Ignite. Unlike traditional methods, Ignite leverages user-consented GPS data (those location request popups) to deliver unparalleled accuracy and reliability.

Our geolocation methodology involves a four-step process that ensures the highest quality data:

1. **High-Accuracy GPS Measurement:** We start by capturing user-consented GPS data with precision, ensuring reliable location tracking.
2. **Data Verification and Enhancement:** We validate the accuracy of each GPS measurement and enhance it with additional contextual information.
3. **Location Mapping:** Using proprietary algorithms, continuously refined for enhanced accuracy, we map your visitors' locations. The more interactions they have on your site, the more precise their location becomes, unlocking opportunities for laser-focused targeting and personalized experiences.
4. **Resident Identification:** We match the address data with public records and marketing databases to identify current residents and their interests.
5. The visitor only shares consented, non-PII geolocation data with us.

Likewise, Launch Labs' API documentation further shows that the Launch Labs back-end platform "identif[ies] a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API)" and "associat[es] the unique identifier to the physical address":

**Annotated Excerpt from Launch Labs' API Documentation**
**(Ex. L)**



72

102. Launch Labs' back-end platform "generat[es] a user profile for the user using the unique identifier and physical address, the user profile comprising profile information that comprises one or more URLs the user has accessed, a frequency with which the user accessed the URL(s), demographics associated with the user, the physical address(es) associated with the user, or devices associated with the user," as claimed in the '947 Patent. Moreover, Launch Labs' API documentation further shows that the Launch Labs back-end platform "generat[es] a user profile" that comprises at least the claimed "one or more URLs the user has accessed," "a frequency with which the user accessed the URL(s)," and "the physical address(es) associated with the user":

**Annotated Excerpt from Launch Labs' API Documentation showing "User Profile" (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

the physical address(es) associated with the user

a frequency with which the user accessed the URL(s)

one or more URLs the user has accessed

In addition, Launch Labs' marketing materials claim that the Launch Labs back-end platform turns website visits into "leads" thereby evidencing that the claimed user profile is generated.

74

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. R)**



103. The Launch Labs back-end platform "updat[es] the profile information based on second anonymous data associated with a second browser session initialized on the user computing device or another user computing device associated with the physical address," and "identif[ies] a second visit to the URL during the second browser session using the unique identifier stored in the local browser cache," as claimed in the '947 Patent. For example, Launch Labs' API documentation evidences that the Launch Labs back-end platform "update[es]

75

the profile information based on second anonymous data associated with a second browser session …"  The Launch Labs API documentation, excerpted and annotated below, shows that the Launch Labs back-end platform tracks multiple website visits and identified different website visits or browsing sessions to the unique identifier.  And, on information and belief, the Launch Labs back-end platform "update[es] the profile information" based on the multiple website visits:

**Annotated Excerpt from Launch Labs' API Documentation showing "User Profile" (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

Launch Labs/Ignite track multiple website visits

Moreover, Launch Labs describes that its Ignite system can update a user profile when the user uses a mobile (*e.g.,* "another user computing device") (Ex. R). Launch Labs touts that "users don't even have to enter their mobile number – they just click an offer button and Ignite will do the rest by grabbing their number, building out their identity record,

77

and sending everything to your CRM" (Ex. Q).  Thus, Launch Labs touts that Launch Labs update the user profile with a website visit from a second user device, a mobile.

104. Launch Labs' back-end platform "determin[es], using the updated profile information, a confidence rating for the user, the confidence rating indicating a quantifiable measure of the user's interest in a product," as claimed in the '947 Patent.  For example, Launch Labs' marketing materials claim that the Launch Labs back-end platform determines a "Traffic Score," which corresponds to the claimed "confidence rating." Launch Labs' marketing materials further claim that the Traffic Score "measures how engaged those captured visitors become … [t]he higher the score, the deeper they dive, signifying their growing interest and readiness to convert":

## Annotated Excerpt from Launch Labs' Marketing Materials (Ex. O)

## Dive Into Data

Once Ignite's launched, you'll receive weekly data-driven insights. Your Performance Reports share four key metrics that ensure the platform is yielding strong results:

1. **Engagement rate**: Remember those anonymous website visitors who slip away unconverted? Ignite brings them back! Track your engagement rate to see how many are captured (think 35% or more!) with personalized offers. This sparks their interest and ignites their journey down the conversion funnel.

2. Traffic score: This is where visitors go from curious clicks to deep dives. The Traffic Score measures how engaged those captured visitors become. Imagine them exploring your website, spending more time, visiting more pages, and returning for more. The higher the score, the deeper they dive, signifying their growing interest and readiness to convert.

3. **Email performance**: Ignite sends dynamic offers tailored to each shopper's specific interests. Track the CTR in your weekly reports. We're aiming for 10% or higher! This metric shows how compelling your offers are and how effectively they are driving visitors back to your site. You'll really start to see Ignite's power here.

4. **Lead conversions**: The ultimate goal is transforming browsers into buyers. Ignite tracks leads sent to your CRM and even breaks down performance by offer. While conversions might not explode in your first month on the platform, expect tremendous growth in the next 60 days as nurtured shoppers reach their buying decision.

Don't just track your Performance Reports. Take action! Use these insights to refine your offers and personalize your emails.

Also, Launch Labs' API literature shows that the Launch Labs back-end platform determines the traffic score (e.g., "confidence rating") and updates the profile with the traffic score.

79

**Annotated Excerpt from Launch Labs' API Documentation
showing "User Profile" (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],

"summary": {
"visit_last": "2021-04-29T14:41:32.000Z",
"visit_first": "2021-03-08T19:42:52.000Z",
"session_count": 7,
"traffic_score": 108,
"page_view_count": 23,
"top_topic_segments": "NEW",
"top_product_segment": "NEW HONDA ACCORD SEDAN",
"traffic_score_stars": 4.5
},

"pages": [...] // list of pages visited
}
```

Confidence
Rating

105. Launch Labs' back-end platform "generat[es] one or more notifications based on one or more of the updated profile information or the confidence rating" and "determin[es] when to send the one or more notifications to the user," as claimed in the '947 Patent. For example, Launch Labs' marketing materials claim that the Launch Labs back-end platform

80

"send[s] dynamic offers tailored to each shopper's specific interests":

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. O)**



Launch Labs' marketing materials further claim that the Launch Labs back-end platform "[r]emember[s] those anonymous visitors browsing your site 30 days ago" and determines that "[n]ow it's prime time to revisit your offers and craft them to be more attractive than ever":

81

## Month 2: Optimize & Amplify Ignite's Impact

### Amp Up Your Offers

Remember those anonymous visitors browsing your site 30 days ago? Ignite has been identifying visitors and storing their interests by category. Now it's prime time to revisit your offers and craft them to be more attractive than ever.

How? By diving into the Audience files under your settings you can learn more about the interests of each segment, allowing you to tailor effective offers. Think targeted deals, specifically designed to ignite interest and accelerate sales. Don't be afraid to get creative! Offers are like rockets: fuel them with compelling benefits to blast past competition**.**

Updating offers is easy with Ignite.. So go ahead, flex your creative muscles and craft irresistible offers!

Launch Labs further describes its Ignite system as being able to "engage site visitors with targeted, personalized content and offers" (Ex. R).

106. Claim 11 of the '947 Patent is a directed to a "non-transitory, machine-readable storage device" that practices the method recited in claim 1 of the '947 Patent (*Compare* Ex. A at 47:44-48:36 *with* Ex. A at 49:16-50:9). For reasons described above in paragraphs 57-104, the Launch Labs back-end platform also infringes by use each limitation of claim 11 of the '947 Patent.

**Launch Labs Infringement of fullthrottle.ai's '219 Patent**

107. Launch Labs directly infringes by using the method claimed in claims 1, 2, and 3 of the '219 Patent and using the non-transitory machine-readable storage device in claims 19, 20, and 21 of the '219 Patent under 35 U.S.C. § 271(a).

82

For example, Launch Labs directly infringed by using the Ignite product with the launchlabs.ai website, retail/brand customers, and agency customers. Launch Labs' use the method of claims 1-3 of the '219 Patent, as described herein, is exemplary of Launch Labs' use of claims 19-21 of the '219 Patent.

108. Launch Labs' back-end platform "receiv[es] campaign level data associated with a campaign," as claimed in the '219 Patent. For example, Launch Labs' marketing materials claim that customers of Launch Labs can "[l]everage Ignite's first-party data to craft laser-focused re-marketing campaigns":

**Annotated Excerpt from Launch Labs'**
**Marketing Materials (Ex. O)**



## Supercharge Ignite With Powerful Modules

Ignite has three modules designed to optimize performance, unlock deeper insights, and boost your ROI:

1. **Conversion Hub**: Think of the Conversion Hub as a convenient on-the-go information hub for your mobile site visitors. This static banner offers easy access to key details, influencing shoppers early in their buying journey. It's the perfect add-on to fuel conversion opportunities wherever they browse.
2. **Post-Offer Claim Qualifier Surveys**: Refine your leads and go beyond basic conversions with targeted surveys triggered upon offer claims. Popular surveys like "Purchase Time Frame" empower your CRM with valuable insights, helping you nurture leads and accelerate sales.
3. **Activating Audiences**: Leverage Ignite's first-party data to craft laser-focused re-marketing campaigns. Your Audience files are constantly updated in the platform to reveal each shopper's top interests. This means you can tailor offers with exceptional precision. Seamlessly export them to platforms like Google, Meta, and even direct mail, then watch your engagement soar.

Your third month on Ignite is the perfect time to start going above and beyond. Only 90 days in, you will achieve so much, kickstarting the transformation of your website into the sales engine you've always wanted.

And this is just the beginning with Ignite!

109. On information and belief, Launch Labs' back-end platform "receiv[es] anonymous data associated with a browser

session initialized by a user via a browser on a user computing device," as claimed in the '219 Patent. For example, as described in paragraphs 92-94 above, Launch Labs' marketing materials and API documentation evidence that Launch Labs' back-end platform uses the above functionality.

110. On information and belief, the Launch Labs back-end platform "determin[es] that the user accessed a uniform resource locator (URL) during the browser session," as claimed in the '219 Patent. On information and belief, the Launch Labs back-end platform tracks page views, *e.g.*, as described in paragraph 95 above. For example, Launch Labs' marketing materials claim that Launch Labs "builds momentum by identifying website visitors":

<strong>Annotated Excerpt from Launch Labs'<br>Marketing Materials (Ex. O)</strong>



## Month 1: Fuel Your Sales Engine

### Set Expectations

While Ignite starts generating leads from day one, sales conversions can take more than 30 days. Remember, we're dealing with anonymous shoppers researching options. Ignite builds momentum by identifying website visitors and their top interests. This then fuels targeted promotions with specific offers, typically driving a 10-15% conversion rate back to your site. This re-engagement leads to longer visits, more page views, and ultimately, higher conversion rates for you.

111. On information and belief, Launch Labs' back-end platform "determin[es] a latitude coordinate and a longitude coordinate of the user computing device, during the browser

84

session, wherein the latitude coordinate and the longitude coordinate are determined based on the anonymous data upon determining that the user opted-out of location tracking, and wherein the latitude coordinate and the longitude coordinate are determined based on geo-location data retrieved from the user computing device upon determining that the user opted-in to location tracking," as claimed in the '219 Patent. For example, as described in paragraph 99-100 above, Launch Labs' marketing materials and API documentation evidence that the Launch Labs back-end platform practices the above functionality.

112. On information and belief, Launch Labs' back-end platform "identif[ies] a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API)," as claimed in the '219 Patent. For example, as described in paragraph 101 above, Launch Labs' marketing materials and API documentation evidence that the Launch Labs back-end platform practices the above functionality.

113. On information and belief, the Launch Labs back-end platform "determin[es] that the physical address is within a

ZIP code covered by the campaign," as claimed in the '219 Patent. As described in paragraphs 102 above, Launch Labs' marketing materials and API documentation evidence that Launch Labs back-end platform identifies and tracks the physical address and ZIP code in its "visitor profiles." And, on information and belief, Launch Labs' back-end platform uses the information in the visitor profiles it generates to track the performance of campaigns, including whether a physical address is within a ZIP code covered by the campaign," as claimed.

114. On information and belief, Launch Labs' back-end platform "determin[es] that the browser session was initiated by the user with an intent to visit the URL," as claimed in the '219 Patent. On information and belief, Launch Labs' back-end platform tracks engagement and the performance of campaigns, including whether certain campaigns or targeted advertisements are successful, which corresponds to the above recited functionality. For example, Launch Labs' marketing materials claim that Launch Labs' customers gain "invaluable insights into your audience's preferences, behaviors, and

86

purchasing habits" and can understand "your audience's preferences, behaviors, and interests":

**Excerpt from Launch Labs' Marketing Materials (Ex. G)**

## What Is First-Party Data?

Central to navigating the shift away from third-party cookies is the power of first-party data. In the world of digital marketing, while all information holds value, not all sources are created equal. First-party data is the cornerstone of actionable marketing insights, providing unique authenticity and potential.

Simply put, first-party data encompasses the valuable information collected directly from your own customers and interactions. This includes website visits, email signups, and purchases acting as an insider's guide to understanding your audience's preferences, behaviors, and interests.

From browsing history and purchase patterns to demographics and contact information, first-party data provides a holistic view of your audience. This empowers you to deliver highly relevant experiences and targeted campaigns that resonate on a deeper level.

Harnessing the potential of first-party data is paramount. By cultivating meaningful relationships and encouraging engagement on your website, you can collect valuable insights that fuel effective and personalized marketing campaigns. From customized recommendations to tailored promotions, the possibilities are endless when you tap into the wealth of data at your fingertips.

**Annotated Excerpt from Launch Labs' Marketing Materials (Ex. G)**

## Grow Your First-Party Data With Ignite

In the midst of these changes, one thing remains clear: the importance of growing your first-party data. As the foundation of your marketing efforts, first-party data provides invaluable insights into your audience's preferences, behaviors, and purchasing habits. By investing in strategies to collect and leverage this data effectively, you can future-proof your marketing efforts and ensure long-term success in a rapidly evolving digital landscape.

The best way to do all that? Ignite, Launch Labs' friction-free technology designed for both you and your visitors. You don't need third-party cookies when you can harness the power of first-party data effortlessly.

With Ignite, you can:

- **Collect invaluable visitor information without intrusive forms or tracking.** Gain deep insights into your audience without compromising their privacy
- **Engage your audience with personalized content based on their interests and preferences.** Deliver relevant experiences that resonate, driving deeper engagement.
- Convert leads into loyal customers with targeted offers and compelling messaging. Utilize precise attribution and measurement to optimize your strategies for maximum ROI.
- **Measure performance with clarity and granularity.** Stitch together disparate data sources and leverage website-specific first-party data models for unparalleled attribution and measurement capabilities.

Ready to thrive in the future of marketing? Schedule a demo and discover how Ignite can empower you to collect, understand, and utilize your first-party data for exceptional results.

87

## Month 3: A Masterclass in Sustaining Momentum

### Keep Your Traffic Coming

Keeping your fire ablaze requires feeding it fuel. In Ignite's case, that fuel is website traffic. The more visitors you attract, the more conversions you'll generate. Don't let damp, irrelevant offers douse your fire's potential. Refresh your offerings regularly, keeping them enticing and targeted.

The more traffic you attract, the more opportunities Ignite has to work its magic. Relevant offers act as kindling, sparking engagement and turning casual browsers into loyal customers. Offers are the key to maximizing platform performance and watching those conversions consistently climb.

### Review, Refine & Recharge

In your third month, it's time for another round of platform optimization. Building on the insights gleaned in month two, let's dive back into your performance data.

**Focus on the fundamentals:** We'll revisit key metrics like engagement rate, offer performance, and lead conversions, ensuring Ignite continues to deliver maximum value. This allows us to identify areas for fine-tuning, ensuring your offers perfectly align with your inventory levels and sales goals.

**Dynamic evolution:** Remember, your target audience is constantly evolving. By consistently reviewing and updating your offers, you stay ahead of the curve, keeping them engaged and moving down the conversion funnel.

This collaborative review process isn't just about checking boxes; it's about unlocking Ignite's full potential. Think of it as a strategic tune-up, propelling your marketing efforts to new heights.

### Build Your Data Powerhouse

Unlock the true power of Ignite by integrating your sales data and activating the Sales Attribution Report. This report reveals precise insights into how Ignite influences every step of your customer journey, from initial interest to sale****

See it all: Track lead conversions, sales conversions, and how Ignite nurtures prospects down the funnel. Gain crystal-clear understanding of the platform's direct impact on your bottom line.

115. On information and belief, the Launch Labs back-end platform "determin[es] a probability that the browser session was initiated in response to watching or listening to media associated with the campaign using the campaign level data," as claimed in the '219 Patent. On information and belief, the Launch Labs back-end platform sends emails and targeted marketing (i.e., media associated with the campaign), and tracks the performance of said emails and targeted marketing, which corresponds to the above recited functionality. As

88

shown below, Launch Labs' marketing materials claim that the

Launch Labs back-end platform uses this functionality.  For

example, Launch Labs' marketing materials state that "Ignite

sends dynamic offers tailored to each shopper's specific

interests," and "[t]rack[s] the CTR in your weekly reports":

**Excerpt from Launch Labs' Marketing Materials (Ex. O)**

## Dive Into Data

Once Ignite's launched, you'll receive weekly data-driven insights. Your Performance Reports share four key metrics that ensure the platform is yielding strong results:

1. **Engagement rate:** Remember those anonymous website visitors who slip away unconverted? Ignite brings them back! Track your engagement rate to see how many are captured (think 35% or more!) with personalized offers. This sparks their interest and ignites their journey down the conversion funnel.

2. **Traffic score:** This is where visitors go from curious clicks to deep dives. The Traffic Score measures how engaged those captured visitors become. Imagine them exploring your website, spending more time, visiting more pages, and returning for more. The higher the score, the deeper they dive, signifying their growing interest and readiness to convert.

3. **Email performance:** Ignite sends dynamic offers tailored to each shopper's specific interests. Track the CTR in your weekly reports. We're aiming for 10% or higher! This metric shows how compelling your offers are and how effectively they are driving visitors back to your site. You'll really start to see Ignite's power here.

4. **Lead conversions:** The ultimate goal is transforming browsers into buyers. Ignite tracks leads sent to your CRM and even breaks down performance by offer. While conversions might not explode in your first month on the platform, expect tremendous growth in the next 60 days as nurtured shoppers reach their buying decision.

Don't just track your Performance Reports. Take action! Use these insights to refine your offers and personalize your emails.

## Month 2: Optimize & Amplify Ignite's Impact

### Amp Up Your Offers

Remember those anonymous visitors browsing your site 30 days ago? Ignite has been identifying visitors and storing their interests by category. Now it's prime time to revisit your offers and craft them to be more attractive than ever.

How? By diving into the Audience files under your settings you can learn more about the interests of each segment, allowing you to tailor effective offers. Think targeted deals, specifically designed to ignite interest and accelerate sales. Don't be afraid to get creative! Offers are like rockets: fuel them with compelling benefits to blast past competition**.**

Updating offers is easy with Ignite.. So go ahead, flex your creative muscles and craft irresistible offers!

### Unlock Repeat Purchases

It's time to reignite the spark by effortlessly reconnecting with happy customers. Ignite's built-in Customer Loyalty Module lets you seamlessly reconnect and transform previous buyers into loyal brand advocates.

Think of it like this: They already know and love you, and they're back on your site. Ignite rekindles their interest with personalized offers based on their previous purchases. It's a win-win for everyone!

Effortlessly import your past customer data into the Customer Loyalty Module. This built-in secret weapon automatically attracts repeat purchases, boosting your Customer Lifetime Value (CLTV) without any heavy lifting. Start reaping the rewards of loyal customers.

**Annotated Excerpt from Launch Labs'
Marketing Materials (Ex. O)**

## Supercharge Ignite With Powerful Modules

Ignite has three modules designed to optimize performance, unlock deeper insights, and boost your ROI.

1. **Conversion Hub**: Think of the Conversion Hub as a convenient on-the-go information hub for your mobile site visitors. This static banner offers easy access to key details, influencing shoppers early in their buying journey. It's the perfect add-on to fuel conversion opportunities wherever they browse.
2. **Post-Offer Claim Qualifier Surveys**: Refine your leads and go beyond basic conversions with targeted surveys triggered upon offer claims. Popular surveys like "Purchase Time Frame" empower your CRM with valuable insights, helping you nurture leads and accelerate sales.
3. **Activating Audiences**: Leverage Ignite's first-party data to craft laser-focused re-marketing campaigns. Your Audience files are constantly updated in the platform to reveal each shopper's top interests. This means you can tailor offers with exceptional precision. Seamlessly export them to platforms like Google, Meta, and even direct mail, then watch their engagement soar.

Your third month on Ignite is the perfect time to start going above and beyond. Only 90 days in, you will achieve so much, kickstarting the transformation of your website into the sales engine you've always wanted.

And this is just the beginning with Ignite!

116. The Launch Labs back-end platform receives anonymous data that "comprises one or more of a time, a date, one or more uniform resource locators (URLs), a referring URL, a browser type, a language, an internet protocol (IP) address,

90

or location data," as recited in claim 2 of the '219 Patent. For example, as described in paragraphs 92-94 and 109 above, the "anonymous data" received by the Launch Labs back-end platform comprises the claimed "time," "date," "referring URL," "browser type," "language," and "internet protocol (IP) address."

117. The Launch Labs back-end platform "determine[es] that the user has not been assigned a unique identifier based on a lack of stored location data for the user computing device" and "assign[s] the unique identifier to the user," as recited in claim 3 of the '219 Patent. For example, as described in paragraph 96 above, Launch Labs' JavaScript computer source code and marketing materials evidences that the Launch Labs back-end platform uses this functionality.

118. The Launch Labs back-end platform "determine[es] whether the user opted-in to or out of location tracking, based on whether a location tracker is installed on the user computing device," as recited in claim 3 of the '219 Patent. For example, as described in paragraph 96 above, Launch Labs' marketing materials claim that the Launch Labs back-end platform uses this functionality.

119. On information and belief, the Launch Labs back-end platform "send[s], upon determining that the user opted-out of location tracking, the unique identifier to the user computing device for storage in a local browser cache," as recited in claim 3 of the '219 Patent. For example, as described in paragraph 98 above, Launch Labs' marketing materials claim that the Launch Labs back-end platform uses this functionality.

120. Claims 19, 20, and 21 of the '219 Patent are directed to a "non-transitory, machine-readable storage device" that practices the method recited in claims 1, 2, and 3 of the '219 Patent (*Compare* Ex. B at 47:50-48:29, *with* Ex. B at 49:11-59). For reasons described above in paragraphs 92-104, the Launch Labs back-end platform also infringes by use each limitation of claim 19, 20, and 21 of the '219 Patent.

**<u>Launch Labs' Infringement of Fullthrottle.ai's '083 Patent</u>**

121. Launch Labs directly infringes by using the method recited in claim 1 of the '083 Patent and using the non-transitory machine-readable storage device recited in claim 11 of the '083 Patent under 35 U.S.C. § 271(a). For example, Launch Labs directly infringes by using the Ignite product with the launchlabs.ai website, retail/brand customers, and agency customers. Launch Labs' use of the method of claim 1 of the '083 Patent, as described herein, is exemplary of Launch Labs' use of claim 11 of the '083 Patent.

122. On information and belief, Launch Labs' back-end platform "receiv[es] first anonymous data associated with a first browser session initialized by a user in a household associated with a campaign via a browser on a user computing device, wherein the first anonymous data comprises one or more of a time, a date, one or more uniform resource locators (URLs), a referring URL, a browser type, a language, an internet protocol (IP) address, or location data," as claimed in the '083 Patent. For example, as described in paragraphs 92-94 above, Launch Labs' Java Script computer source code

and marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

123. The Launch Labs back-end platform "determin[es] that the user accessed a URL associated with the campaign during the first browser session," as claimed in the '083 Patent. For example, as described in paragraph 95 above, Launch Labs' marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

124. The Launch Labs back-end platform "determin[es] that the user has not been assigned a unique identifier based on a lack of stored location data for the user computing device" and "assign[s] the unique identifier to the user," as claimed in the '083 Patent. For example, as described in paragraphs 96 above, Launch Labs' Java Script computer source code and marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

125. The Launch Labs back-end platform "determin[es] whether the user opted-in to or out of location tracking, based on whether a location tracker is installed on the user computing," as claimed in the '083 Patent. For example, as described in paragraph 97 above, Launch Labs' marketing

94

materials evidence that Launch Labs' back-end platform uses the above functionality.

126. The Launch Labs back-end platform "send[s], upon determining that the user opted-out of location tracking, the unique identifier to the user computing device for storage in a local browser cache," as claimed in the '083 Patent. For example, as described in paragraph 98 above, Launch Labs' Java Script computer source code and marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

127. The Launch Labs back-end platform "determin[es] a latitude coordinate and a longitude coordinate of the user computing device, during the first browser session, wherein the latitude coordinate and longitude coordinate are determined based on the anonymous data upon determining that the user opted-out of location tracking, and wherein the latitude coordinate and the longitude coordinate are determined based on geo-location data retrieved from the user computing device upon determining that the user opted-in to location tracking," as claimed in the '083 Patent. For example, as described in paragraphs 99-100 above, Launch

Labs' marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

128. The Launch Labs back-end platform "identif[ies] a physical address for the user based on the determined latitude coordinate and the determined longitude coordinate using a map application programming interface (API), wherein the physical address is associated with the household covered by the campaign;," as claimed in the '083 Patent. For example, as described in paragraph 101 above, Launch Labs' Java Script computer source code and marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

129. The Launch Labs back-end platform "associat[es] the unique identifier to the physical address," as claimed in the '083 Patent. For example, Launch Labs' API literature shows that the Launch Labs back-end platform "associat[es] the unique identifier to the physical address," as claimed:

96

**Annotated Excerpt from Launch Labs' API Documentation showing "User Profile" (Ex. L)**

```
{
"id": 59378,
"latitude": 35.783336,
"longitude": -78.848969,
"street": "406 Daylin Dr",
"city": "Cary",
"state": "nc",
"zip": "27519",
"resident": "JON SNOW",
"hashed_emails": [
"1ca81507aa511c9501c24cdea61e06",
"4f19af40f5ba74309b1dc0e594aa8d"
],
```

Unique Identifier

associated with

Physical Address

130. The Launch Labs back-end platform "generat[es] a user profile for the user using the unique identifier and the physical address, the user profile comprising profile information that comprises one or more URLs the user has accessed, a frequency with which the user accessed the URL(s), demographics associated with the user, the address( es) associated with the user, or the devices associated with the user," as claimed in the '083 Patent. For example, as described in paragraph 101 above, Launch Labs' marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

97

131. The Launch Labs back-end platform "determin[es], using the profile information, a confidence rating for the user, the confidence rating indicating a quantifiable measure of the user's interest in a product associated with the campaign," as claimed in the '083 Patent. For example, as described in paragraph 104 above, Launch Labs' API documentation and marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

132. The Launch Labs back-end platform "generat[es] one or more notifications based on one or more of the profile information or the confidence rating," as claimed in the '083 Patent. For example, as described in paragraph 105 above, Launch Labs' marketing materials evidence that Launch Labs' back-end platform uses the above functionality.

133. The Launch Labs back-end platform "determin[es] whether the household performed a transaction associated with the campaign," as claimed in the '083 Patent (*see generally* paragraphs 72-90, 94-120). For example, Launch Labs' marketing materials claims that the Launch Labs back-end platform tracks "across the entire customer lifecycle" and "doesn't just build a profile for first-time customers,"

"[i]t re-evaluates shopper interest every time that shopper returns to your site":

**Excerpt from Launch Labs' Marketing Materials (Ex. X)**

# Know Your Customers Better With Each Visit to Your Site

AI powered personalization across the entire customer lifecycle delivers 3x return on investment or more for marketers. So Ignite doesn't just build a profile for first-time customers. It re-evaluates shopper interest every time that shopper returns to your site. That means customers get a personalized experience whether it's their first visit or their 50th.

134. Claim 11 of the '083 Patent is directed to a "non-transitory, machine-readable storage device" that practices the method recited in claim 1 of the '083 Patent (*Compare* Ex. C at 47:47-48:34, *with* Ex. C at 49:18-50:4). For reasons described above in paragraphs 121-133, the Launch Labs back-end platform also infringes by use each limitation of claim 11 of the '083 Patent.

**Launch Labs' Infringement is Damaging Fullthrottle.ai**

135. Launch Labs uses its infringing technology to directly compete with fullthrottle.ai in at least two markets. First, Launch Labs competes with fullthrottle.ai for agency customers. For example, on information and belief, Launch Labs entered into an agreement with CF Search Marketing

99

based out of 600 Fairway Drive, No. 208, Deerfield Beach, Florida 33441. CF Search Marketing advertises its ShopperID product can "[t]urn anonymous website traffic into qualified leads (Ex. U, https://www.cfsearchmarketing.com/shopperid/). On information and belief, Launch Labs' Ignite product is used by CF Search Marketing in connection with the ShopperID product/service. On information and belief, CF Search Marketing is promoting and selling access to Lauch Labs to use its infringing technology with CF Search Marketing's customers.

**CF Search Marketing Website Excerpt (Ex. U)**



136. Launch Labs also directly competes with fullthrottle.ai in the brand/retail market. For example, Launch Labs touts its success with the Ignite product in the automotive industry. Launch Labs claims that Ignite has been

100

used by a "Metro Atlanta Honda dealer" to create a "remarkable transformation" and increase the dealers new and used vehicle sales and service revenue (Ex. U, https://www.launchlabs.ai/case-study/atlanta-honda-dealership-case-study).

**Excerpts from Launch Labs Website (Ex. V)**



# Fueling Success Without Increasing Ad Budget

Within the first 30 days on Ignite, a Metro Atlanta Honda dealer experienced a remarkable transformation in the performance of their

**40%**
Visitor Return Rate

**20%**
Lead Volume Increase

"When we compared the return rate of Ignite visitors with our current retargeting efforts, we immediately noticed an increase in returning visitors and more leads. Ignite works. We grossed over $44,000 in our first month in new and used vehicles, and picked up more than $14,500 in service revenue. We are on pace to gross more in month two."

General Manager
Atlanta Honda Dealership

137. Fullthrottle.ai is being damaged by Lauch Labs' infringement including lost sales/profits to agencies and brands/retailers. If not for Launch Labs' infringement, fullthrottle.ai would have entered into the agreements with Launch Labs' agency and retail customers. At a minimum, fullthrottle.ai is suffering damages in the form of a reasonable royalty under 35 U.S.C. § 284.

138. On information and belief, Launch Labs' infringement has been willful and with knowledge of fullthrottle.ai's patents.

139. On information and belief, Lauch Labs has been aware of fullthrottle.ai's patents because the parties are direct competitors and have had prior communications regarding intellectual property issues. Fullthrottle.ai identifies the Asserted Patents on its website splash page as shown below and states that its system is "Powered by Patented Technology" (Ex. W).

## Fullthrottle.ai Webpage (Ex. W)



**fullthrottle.ai<sup>TM</sup> Honors & Accolades**

    

We generate first-party data for a cookieless world and utilize AI to optimize your sales results

*Powered by Patented Technology*

In addition, fullthrottle.ai has issued press releases providing notice of its patents. On January 23, 2023, fullthrottle.ai issued a press release, which is available on the full throttle.ai website, providing notice of its '947 and 219 Patents (Exs. S & T).

140. The parties have had prior intellectual property disputes. In February 2022, fullthrottle.ai notified Launch Labs that fulltrottle.ai was concerned that Launch Labs was violating fullthrottle.ai's trademark rights. Launch Labs retained intellectual property counsel and responded to fullthrottle.ai's letter.

103

141. Based on the close competition between the parties and their prior disputes, on information and belief, at least one Launch Labs employee or counsel was aware of the Asserted Patents. On information and belief, at least one Launch Labs employee or counsel visited the fullthrottle.ai website and had notice of the fullthrottle.ai Asserted Patents and their applicability to Launch Labs.

142. On information and belief, Launch Labs' conduct has been willful and egregious. On information and belief, Launch Labs knew of the Asserted Patents and proceeded to willfully infringe the Asserted Patents with knowledge of its infringement.

## Count I: Launch Labs' Direct Infringement of the '947 Patent (35 U.S.C. § 271(a))

143. Fullthrottle.ai restates, realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

144. Fullthrottle.ai is the assignee of the '947 Patent and has the right to bring this action.

145. In violation of 35 U.S.C. § 271(a), Launch Labs has directly infringed and continues to directly infringe, both literally and/or under the doctrine of equivalents, the '947 Patent by at least using, including within this District, its Ignite product which infringes at least claims 1 and 11 of the '947 Patent without license from fullthrottle.ai.

146. Launch Labs has had actual or constructive knowledge of the '947 Patent since at least the filing date of this Complaint as described herein.

147. Fullthrottle.ai has complied with the patent marking statute 35 U.S.C. § 287 by identifying its patents on its website (Exs. S and T). For example, fullthrottle.ai announced the issuance of the Asserted Patents and stated that the Asserted Patents "help[] protect many of the core technologies on which FullThrottle platform capabilities have

105

been built including audience identification, lifecycle acceleration, and lead generation" (Ex. S).

148. As a result of Launch Labs' infringement of the '947 Patent, fullthrottle.ai has been damaged and will continue to suffer damages in the future. Fullthrottle.ai is entitled to recover for damages, including in the form of lost profits and/or a reasonable royalty sustained as a result of Launch Labs' wrongful acts in an amount to be determined at trial and to receive such other and further relief, including equitable relief, as this Court deems just and proper. By way of a non-limiting example, fullthrottle.ai has suffered lost profits due to Launch Labs' infringement. To the extent that fullthrottle.ai has not suffered lost profits due to any of Launch Labs' infringement, fullthrottle.ai is entitled to damages in the form of a reasonable royalty.

149. Fullthrottle.ai will be irreparably harmed if Launch Labs' infringement of the '947 Patent is not enjoined, including because, for example, Launch Labs and fullthrottle.ai are direct competitors, fullthrottle.ai has lost sales and market share due to Launch Labs' infringement,

there is a nexus between Launch Labs' infringement and the irreparable harm (*e.g.*, Launch Lab's infringement has caused the lost sales).

150. On information and belief, Launch Labs' infringement of the '947 has been and continues to be deliberate and willful.

151. Based on at least Launch Labs' willful infringement and replication of fullthrottle.ai's platform, this case is exceptional and, therefore, fullthrottle.ai is entitled to an award of attorney fees pursuant to 35 U.S.C. § 285 and enhanced damages.

## Count II: Launch Labs' Direct Infringement of the '219 Patent (35 U.S.C. § 271(a))

152. Fullthrottle.ai restates, realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

153. Fullthrottle.ai is the assignee of the '219 Patent and has the right to bring this action.

154. In violation of 35 U.S.C. § 271(a), Launch Labs has directly infringed and continues to directly infringe, both literally and/or under the doctrine of equivalents, the '219 Patent by at least using, including within this District, its Ignite product which infringes at least claims 1, 2, 3, 19, 20, and 21 of the '219 Patent without license from fullthrottle.ai.

155. Launch Labs has had actual or constructive knowledge of the '219 Patent since at least the filing date of original complaint, as described herein.

156. Fullthrottle.ai has complied with the patent marking statute 35 U.S.C. § 287 by announcing the issuance of the Asserted Patents on its website and stating that Asserted Patents "help[] protect many of the core technologies on which FullThrottle platform capabilities have been built including

108

audience identification, lifecycle acceleration, and lead generation" (Exs. S and T).

157. As a result of Launch Labs' infringement of the '219 Patent, fullthrottle.ai has been damaged and will continue to suffer damages in the future. Fullthrottle.ai is entitled to recover for damages, including in the form of lost profits and/or a reasonable royalty sustained as a result of Launch Labs' wrongful acts in an amount to be determined at trial and to receive such other and further relief, including equitable relief, as this Court deems just and proper. By way of a non-limiting example, fullthrottle.ai has suffered lost profits due to Launch Labs' infringement. To the extent that fullthrottle.ai has not suffered lost profits due to any of Launch Labs' infringement, fullthrottle.ai is entitled to damages in the form of a reasonable royalty.

158. Fullthrottle.ai will be substantially and irreparably damaged and harmed if Launch Labs' infringement of the '219 Patent is not enjoined, including because, for example, Launch Labs and fullthrottle.ai are direct competitors, fullthrottle.ai has lost sales and market share

due to Launch Labs' infringement, there is a nexus between Launch Labs' infringement and the irreparable harm (*e.g.*, Launch Lab's infringement has caused the lost sales).

159. On information and belief, Launch Labs' infringement of the '219 Patent has been and continues to be deliberate and willful.

160. Based on at least Launch Labs' willful infringement and replication of fullthrottle.ai's platform, this case is exceptional and, therefore, fullthrottle.ai is entitled to an award of attorney fees pursuant to 35 U.S.C. § 285 and enhanced damages.

110

## Count III: Launch Labs' Direct Infringement of the '083 Patent (35 U.S.C. § 271(a))

161. Fullthrottle.ai restates, realleges and incorporates each of the preceding paragraphs as if fully set forth herein.

162. Fullthrottle.ai is the assignee of the '083 Patent and has the right to bring this action.

163. In violation of 35 U.S.C. § 271(a), Launch Labs has directly infringed and continues to directly infringe, both literally and/or under the doctrine of equivalents, the '083 Patent by at least using, including within this District, its Ignite product which infringes at least claims 1 and 11 of the '083 Patent without license from fullthrottle.ai.

164. Launch Labs has had actual or constructive knowledge of the '083 Patent since at least the filing date of this Complaint.

165. Fullthrottle.ai has complied with the patent marking statute 35 U.S.C. § 287 by providing actual notice with this Complaint.

166. As a result of Launch Labs' infringement of the '083 Patent, fullthrottle.ai has been damaged and will continue to suffer damages in the future. Fullthrottle.ai is

111

entitled to recover for damages, including in the form of lost profits and/or a reasonable royalty sustained as a result of Launch Labs' wrongful acts in an amount to be determined at trial and to receive such other and further relief, including equitable relief, as this Court deems just and proper. By way of a non-limiting example, fullthrottle.ai has suffered or will suffer lost profits due to Launch Labs' infringement. To the extent that fullthrottle.ai has not suffered lost profits due to any of Launch Labs' infringement, fullthrottle.ai is entitled to damages in the form of a reasonable royalty.

167. Fullthrottle.ai will be substantially and irreparably damaged and harmed if Launch Labs' infringement of the '083 Patent is not enjoined, including because, for example, Launch Labs and fullthrottle.ai are direct competitors, fullthrottle.ai has lost sales and market share due to Launch Labs' infringement, there is a nexus between Launch Labs' infringement and the irreparable harm (*e.g.*, Launch Lab's infringement has caused the lost sales).

168. On information and belief, Launch Labs has been aware of the '083 Patent since it issued. On information and

belief, Launch Labs' infringement of the '083 Patent has been and continues to be deliberate and willful.

169. Based on at least Launch Labs' willful infringement and replication of fullthrottle.ai's platform, this case is exceptional and, therefore, fullthrottle.ai is entitled to an award of attorney fees pursuant to 35 U.S.C. § 285 and enhanced damages.

## Prayer for Relief

WHEREFORE, fullthrottle.ai prays that the Court order the following relief:

a. Judgment that Launch Labs directly infringed the '947 Patent under 35 U.S.C. § 271(a);

b. Damages be awarded to fullthrottle.ai due to Launch Labs' infringement of the '947 Patent;

c. Judgment that Launch Labs' infringement of the '947 Patent was willful, that this case is exceptional, and an award of enhancement damages to fullthrottle.ai for Launch Labs' infringement of the '947 Patent;

d. Judgment that Launch Labs directly infringed the '219 Patent under 35 U.S.C. § 271(a);

e. Damages be awarded to fullthrottle.ai due to Launch Labs' infringement of the '219 Patent;

f. Judgment that Launch Labs' infringement of the '219 Patent was willful, that this case is exceptional, and an award of enhancement damages to fullthrottle.ai for Launch Labs' infringement of the '219 Patent;

114

g.  Judgment that Launch Labs directly infringed the '083 Patent under 35 U.S.C. § 271(a);

h.  Damages be awarded to fullthrottle.ai due to Launch Labs' infringement of the '083 Patent;

i.  Judgment that Launch Labs' infringement of the '083 Patent was willful, that this case is exceptional, and an award of enhancement damages to fullthrottle.ai for Launch Labs' infringement of the '083 Patent;

j.  Judgment and award of fullthrottle.ai's reasonable attorney fees;

k.  Judgment that Launch Labs and those acting in concert with Launch Labs should be permanently enjoined from infringing the '947, '219, and '083 Patents;

l.  Judgment that fullthrottle.ai be awarded its costs; and

m.  Judgment that fullthrottle.ai be awarded such other relief as the Court may deem necessary and proper.

## Demand for Jury Trial

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, fullthrottle.ai respectfully demands a trial by jury on all issues so triable.

Dated: August 7, 2024    Respectfully submitted,

*/s/Michael J. Bonella*
**FLASTER GREENBERG P.C.**
Michael J. Bonella (appearing
pursuant to L.R. 83.1(d))
Aakash K. Patel (appearing pursuant
to L.R. 83.1(d))
Coraleine J. Kitt (appearing
pursuant to L.R. 83.1(d))
1717 Arch Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 587-5679
Facsimile: (215) 279-9394
michael.bonella@flastergreenberg.com
aakash.patel@flastergreenberg.com
coraleine.kitt@flastergreenberg.com

**WILLIAMS MULLEN, P.C.**
Andrew R. Shores, NC Bar No. 46600
Carmelle F. Alipio, NC Bar No. 54738
301 Fayetteville Street, Suite 1700
Raleigh, NC  27601
Telephone: (919) 981-4055
Facsimile: (919) 981-4300
ashores@williamsmullen.com
calipio@williamsmullen.com

## <u>Certificate of Service</u>

I, Michael J. Bonella, certify that fullthrottle.ai's First Amended Complaint was filed using the Court's electronic filing system on August 7, 2024, which will send notification and a copy of such filing to all counsel of record.

<u>*/s/ Michael J. Bonella*</u>
Michael J. Bonella